# UTAH NATIONAL BANK OF SALT LAKE CITY v. NELSON.

No. 2102. Decided August 27, 1910. Rehearing Denied November 22, 1910 (111 Pac. 907).

1. BILLS AND NOTES—ACTION—PLEADING—CONSIDERATION. Under Comp. Laws 1907, sec. 1576, providing that every negotiable instrument is deemed prima facie to have been issued for a valuable consideration, in an action on a note, it is not necessary to allege or prove a consideration to make out a prima facie case. (Page 177.)

2. BILLS AND NOTES—ACTION—FINDINGS—CONSIDERATION—NECESSITY. Since a consideration need not be alleged or proved to make out a prima facie case in an action on a note, if defendant does not affirmatively allege want of consideration, a finding of consideration need not be made. (Page 178.)

3. BILLS AND NOTES—FINDINGS—GENERAL FINDINGS—SUFFICIENCY. In an action on a note, where the answer alleged generally that it was without consideration, a general finding that it was executed for a valuable consideration, received by the maker, negatived the affirmative allegation of the answer and was sufficient to support a verdict for plaintiff. (Page 179.)

4. TRIAL—FINDINGS—ULTIMATE FACTS—CONCLUSIONS OF LAW. A finding that the note sued on, alleged generally by the answer to have been executed without consideration, was delivered for a valuable consideration, was a finding of an ultimate fact and not a conclusion of law.[1] (Page 181.)

5. BILLS AND NOTES—ACTIONS—SUFFICIENCY OF EVIDENCE. In an action on a note executed by defendant, the cashier of plaintiff

[1] Kahn v. Central Smelting Co., 2 Utah 371; Snyder v. Emerson, Auditor, 19 Utah 319, 57 Pac. 300.

bank, which, together with a sum advanced by the president, was deposited in the bank to make up a defalcation and prevent a run on the bank, evidence *held* to show that such officers did not regard the amount advanced as a loan to the bank, to be returned regardless of whether the money stolen should be otherwise replaced. (Page 184.)

6. CONTRACTS—"CONSIDERATION." There is a sufficient consideration for a promise whenever the act of the promisee results in a benefit to the promisor, or at his request, to a third person, or imposes a loss or inconvenience, or obligation on the promisee at the instance of the promisor, though no advantage result to him. (Page 185.)

7. BILLS AND NOTES—CONSIDERATION—PROMISE FOR THIRD PARTY. Defendant, the cashier of plaintiff bank, executed a note, which, together with a sum advanced by the president, was deposited as a part of the bank's assets, to make up the amount of a defalcation. While the principal purpose in making the deposit was to prevent a run on the bank, it appeared that the president would have refused to advance the amount advanced by him if defendant had not agreed to advance the amount of the note. *Held*, under the rule that, where a promise is made between two parties for the benefit of a third, an action will lie thereon by the party to be benefited, that the execution of the note by defendant was supported by a sufficient consideration so as to authorize an action thereon by the bank.[2] (Page 189.)

8. BILLS AND NOTES—CONSIDERATION—CONTRIBUTION TO COMMON UNDERTAKING. The note was also supported by a sufficient consideration under the rule making mutual promises to contribute toward a common undertaking a sufficient consideration for each of them. (Page 189.)

9. BILLS AND NOTES—"CONSIDERATION"—FORBEARANCE—EXERCISE OF LEGAL RIGHT. When defendant, the cashier of plaintiff bank, executed a note to the bank in order to make up in part a defalcation by some unknown person, he believed that he was legally liable for at least a part of the defalcation, as did the president and vice-president; but there was a controversy as to the amount defendant should pay, which was left to the vice-president, who decided that defendant should pay the amount of the note, whereupon defendant, without protest, executed the note to the bank for that amount without any promise of reimbursement unless the stolen money should be recovered or the stockholders voluntarily assess themselves to replace it. Defendant, as cashier, was custodian of the money stolen. *Held*, that the arrangement between defendant and the other

---

[2] Montgomery v. Rief, 15 Utah 495, 50 Pac. 623; McKay v. Ward, 20 Utah 157, 57 Pac. 1024, 46 L. R. A. 623.

officers was a compromise of any claim the bank had against defendant, the subsequent ratification of which by the directors released defendant from any claim by the bank, and such compromise was a sufficient "consideration" for the execution of the note, even if defendant were not actually liable for the defalcation; any suspension or forbearance in good faith of a legal right being sufficient to sustain a promise.    (Page 192.)

10.  BILLS AND NOTES—CONSIDERATION—SUFFICIENCY. Defendant bank cashier and the president of the bank agreed to each pay a certain sum into the bank in order to make up a defalcation to prevent a run on the bank; defendant executing a note for thirteen thousand two hundred and fifty dollars to the bank for his part, and the president paying in a certain amount in cash. The cash payment by the president enhanced the value of defendant's stock in the bank about one thousand two hundred and fifty dollars, saved a probable run on the bank, and prevented it from being closed by the Comptroller of the Currency. Held, that a valuable consideration moved from the president to defendant for the latter's execution of the note to the bank.    (Page 195.)

11.  BILLS AND NOTES—ACTIONS—SUFFICIENCY OF EVIDENCE. In an action on a note executed by defendant, the cashier of plaintiff bank, under an arrangement between him and the president by which each contributed a certain sum to make up a defalcation and prevent a run on the bank, evidence held to show that defendant executed the note in good faith with an intention to pay it.    (Page 195.)

12.  EVIDENCE—PRESUMPTIONS—FAIR DEALING. An explanation of a transaction which is consistent with good faith and fair dealing will be adopted rather than one involving fraud, where the transaction is explainable upon either theory.    (Page 196.)

13.  STATUTES—CONSTRUCTION—STATUTES IN PARI MATERIA. The negotiable instrument act is not in pari materia with the statute relating to mortgage foreclosure proceedings, not relating to the same general subject-matter.    (Page 198.)

14.  BILLS AND NOTES—ATTORNEY'S FEE—PROOF OF PAYMENT—NECESSITY. The amount stipulated as an attorney's fee in a negotiable note will be assumed to be a proper fee, in absence of contrary evidence, unless it clearly appears to be unreasonable, and such amount will be allowed without a showing that it was actually charged, paid, or agreed to be paid; Comp. Laws 1907, sec. 3504, providing that in all cases of foreclosure, when an attorney's fee is claimed, no greater amount shall be allowed than the sum shown by the evidence to be actually charged by and to be paid to the attorney, and section 3505 requiring such fee to be fixed by the court in the foreclosure proceeding, notwithstanding

any contrary stipulation in the mortgage, only applying to fore-
closure proceedings and not to stipulations for attorney's fees
in notes.   (Page 199.)

STRAUP, C. J., dissenting.

APPEAL from District Court, Third District; *Hon. Geo.
G. Armstrong,* Judge.

Action by the Utah National Bank of Salt Lake City,
Utah, against Joseph Nelson.

Judgment for plaintiff.   Defendant appeals.

AFFIRMED.

### STATEMENT OF FACTS.

Plaintiff, a corporation organized and existing under the
laws of Congress, brought this action to recover from defend-
ant upon a promissory note.   The complaint alleges, in sub-
stance:   That the defendant, on January 22, 1908, at Salt
Lake City, Utah, for value received, executed and delivered
to plaintiff his certain promissory note, and thereby prom-
ised, on thirty days' demand after date, to pay to the order
of plaintiff thirteen thousand, two hundred and fifty dollars,
with interest at six per cent. per annum from date until paid,
and to pay ten per cent. additional as attorney's fee if the
note should be placed in the hands of an attorney for col-
lection; that payment of the note was demanded September
11, 1908, but the defendant refused to pay the same, or any
part thereof; that the note was placed in the hands of attor-
neys for collection.   The answer admitted each allegation
in the complaint, with the exception that it denied that the
note was given "for value received."   The answer also con-
tained the following affirmative allegation, namely:   "That
the promissory note signed by the defendant and delivered
by him to the plaintiff, as alleged in said complaint, was
without consideration, and that no consideration whatever

passed or was given for the said promissory note; . . . that neither the plaintiff nor any other person ever paid any sum of money or any other thing, or ever suffered or received any detriment as a consideration for the signing and delivery of the said promissory note; and that said note was wholly without consideration." The case was tried to the court without a jury. The facts, circumstances, and conditions under which defendant executed the note, as disclosed by the record, are as follows:

The capital stock of plaintiff bank consisted of two thousand shares of the par value of one hundred dollars per share. W. S. McCornick, the president of the bank, was the owner of one thousand shares, and Joseph Nelson (defendant), cashier, was the owner of fifty shares of the capital stock of the bank. On or about January 12, 1908, it was discovered that one hundred and six thousand, two hundred and fifty dollars in some manner unknown had been abstracted, taken, or stolen from the vault of the bank, a large amount of which, if not all, constituted the legal reserve fund of the bank. Soon after the loss was discovered, McCornick and Nelson had several conferences, in which they discussed the probable effect the loss would have on the institution in case its depositors and the public generally should be advised of the situation before the loss to the bank was made good, and they came to the conclusion that, as they were in the midst of a financial panic, unless some immediate action was taken to repair the loss, a "run" would be made on the bank which would be very disastrous to the institution. Moreover, they knew that it would be a matter of a short time only before the United States Bank Examiner would make an examination of the bank and check up its assets and liabilities, and unless the loss was made good before the examination took place it would result in the Comptroller of the Currency closing the doors of the bank and winding up its affairs. So critical, in their opinion, was the situation, that they were afraid to inform the board of directors of the loss, because, as stated by Mr. McCornick in his testimony, "it would be very dangerous to allow so large a body as the board of di-

rectors to know what had happened, . . . . as some of them might leak, and it would become common property." Therefore, in order to avoid the ruin with which the bank was threatened, it was agreed between them that McCornick should put up fifty thousand dollars and Nelson thirteen thousand, two hundred and fifty dollars toward making good the loss. In pursuance of this agreement, McCornick paid into the bank fifty thousand dollars and Nelson executed the note in question. There is an apparent conflict in the evidence respecting the conditions as fixed by themselves under which the money and note were delivered to the bank. According to Nelson's version of what was said and done on that occasion, Mr. McCornick insisted that Nelson should put up thirteen thousand, two hundred and fifty dollars, and Nelson claimed that he should be required to pay only a sum equal to what his assessment would be in case the outstanding capital stock were assessed to make good the loss; that they agreed to and did leave the decision of the controversy to Thomas R. Cutler, vice president of the bank; that he decided that, as McCornick was putting up fifty thousand dollars, Nelson should pay into the bank thirteen thousand, two hundred and fifty dollars, that these sums, with forty-three thousand dollars taken from the surplus fund of the bank, made up the entire loss. Nelson further testified that at the time he signed the note it was agreed between himself, McCornick, and Cutler that later on the matter should be brought before the board of directors, and the board would be asked to devise means to refund the money put up by himself and McCornick, and in case the board acted favorably on the matter, or the bank should succeed in recovering the stolen money, or any part thereof, that he (Nelson) should be paid one-half of the amount put up by him before McCornick should receive any part of the fifty thousand dollars, paid by him. McCornick testified that he insisted that Nelson was responsible for the entire loss because he was the custodian of the bank's funds, and that Nelson protested that he was not liable for the whole of the loss because there was another officer of the bank who knew

the combination of the paticular vault or chest from which the money was taken and who had equal charge with himself of the funds. McCornick further testified that Nelson at first insisted that each of them should put up pro rata according to the interest he owned in the bank, but finally agreed, upon McCornick's offering to put up fifty thousand dollars, to pay thirteen thousand, two hundred and fifty dollars toward making good the loss; that a controversy then arose between them as to how they should be reimbursed in case the money stolen, or any part of it, should be recovered, or the stockholders of the bank should voluntarily assess themselves in order to refund the money; that they agreed to and did submit the question as to how they should be reimbursed in case of the happening of either of the contingencies mentioned, to Mr. Cutler; that he decided Nelson should be paid one-half of the amount paid in by him before McCornick should receive anything; that he (McCornick) would not have paid any money to the bank if Nelson had not paid the thirteen thousand, two hundred and fifty dollars in question; and that in making the agreement with Nelson he acted for the benefit of the bank. On cross-examination he testified on this point in part as follows: "Q. I understand you were contracting that the bank might have the benefit of your arrangement, is that right? A. Certainly the bank would get the benefit of it. Q. The contract was between you and Mr. Nelson for the benefit of the bank, was that right? A. Benefit of the bank, certainly. Q. In other words, you claim as part of the consideration for this note that you agreed to give a sum provided he gave a sum? A. Yes." And again, an answer to the following, "Were you contracting on behalf of yourself . . . or on behalf of the bank for the money to go into the bank?" he answered, "Well, I was contracting for the bank, of course." And in answer to the following question, "Were you contracting for the bank when you told him you would give fifty thousand dollars?" McCornick answered: "Certainly I was, for the benefit of the bank. . . . Whose benefit would it be?"

Thomas R. Cutler testified that when Nelson spoke to him about the matter Nelson did not seem to object so much to the payment of the thirteen thousand, two hundred and fifty dollars, as he did to McCornick's being reimbursed for any part of the money put up by him before he (Nelson) was paid in full, in case any part of the stolen money should be recovered, or an assessment should be levied against the capital stock of the bank; that McCornick and Nelson seemed to have agreed upon the amount that each should pay, namely, McCornick fifty thousand dollars and Nelson thirteen thousand, two hundred and fifty dollars.

The record also shows that the note and money were received by and became a part of the assets of the bank, and that the board of directors met and ratified the transaction.

The court, among other things, found, so far as material here: "That, for a valuable consideration received by defendant, he executed and delivered his promissory note (the note in question) to plaintiff; . . . that all of the allegations contained in plaintiff's complaint filed herein are true, and all the denials and allegations of said defendant in his answer are untrue, except as to the admissions therein contained." As a conclusion of law the court found that plaintiff was entitled to judgment against defendant for the principal of the note, thirteen thousand, two hundred and fifty dollars and interest thereon amounting to eleven hundred and four dollars and sixteen cents, and for attorney's fee amounting to thirteen hundred and twenty-five dollars, and rendered judgment in favor of plaintiff for the sum of fifteen thousand, six hundred and seventy-nine dollars and sixteen cents and costs of suit. To reverse the judgment defendant has brought the case to this court on appeal.

*Young & Snow* for appellant.

*Van Cott, Allison & Riter* for respondent.

McCARTY, J. (after stating the facts as above).

Appellant in his assignment of errors, alleges "that the court erred in that it failed to find the facts, if any there

were, constituting, or which could constitute, any considera-
tion for the contract or promissory note," and insists that
the finding made by the court, namely, "that for a valuable
consideration received by said defendant he (the defendant)
executed the promissory note mentioned," was a mere con-
clusion of law and not a finding of fact at all. It is also
alleged in the assignment of errors that "the court erred in
making its final decision for the reason that there is no evi-
dence showing a consideration for the contract which was the
subject-matter of the action," and that the court erred in
allowing and including in the judgment thirteen hundred
and twenty-five dollars as attorney's fee.

The questions presented will be considered in the order
in which we have stated them. The note sued on being a ne-
gotiable instrument, it was not necessary for plaintiff to
either plead or prove a consideration in order to make out
a prima facie case. Section 1576, Comp. Laws Utah,
1907, provides that "every negotiable instrument is
deemed prima facie to have been issued for a valuable
consideration, and every person whose signature appears
thereon to have become a party thereto for value." In 9
Cyc. 717, the rule is illustrated as follows: "If the con-
tract in suit is under seal, it imports a consideration and
none need be alleged; and the same is true if the instrument
sued on is negotiable according to the law merchant. And
by statute in some jurisdictions every written contract is
made to import a consideration, and, where this is so, it is
not necessary for the plaintiff to allege the consideration."
In 4 Ency. Pl. and Pr. 928, it is said: "In the absence
of statutory enactments to the contrary, it is necessary, in
actions upon contracts, to allege a consideration, except in
the case of contracts under seal, bills of exchange, and nego-
tiable promissory notes, all of which by intendment of law
import a consideration." In 2 Bates, Pl., Pr. and Forms,
1058, the author tersely and correctly states the rule as fol-
lows: "As a note, bill, or check imports a consideration,

none need be averred under the rule that it is not necessary to plead what is implied in law."

Counsel for appellant recognize the rule as stated in the foregoing citations. In their printed brief they say: "However, defendant contends that, although the authorities hold that in an action upon a negotiable instrument no consideration need be pleaded, still that rule exists only for the reason that a consideration is presumed; but in the case at bar the question of consideration is expressly put in issue, and a finding of fact upon that issue must be made in the same manner as though the action was upon a non-negotiable instrument which did not imply a consideration." If it is not necessary to plead a consideration when a contract of this kind is the subject-matter of the action, it necessarily follows that it is not necessary to prove one in order for the plaintiff to make out a prima facie case, and unless the defendant pleads affirmatively that there is no consideration for the contract no finding of a consideration need be made. But some authorities seem to hold that as to affirmative allegations in an answer it is sufficient for the court to find generally that they are untrue, and it is not essential in order to support a judgment for plaintiff that an affirmative finding be made stating the facts in detail upon which the defendant relied as a defense under the affirmative allegations in his answer. In the case of McLennan v. Wilcox, 126 Cal. 52, Pac. 306, the court says: "The answer also sets up the statute of limitations as a defense. It is claimed that the court failed to find upon defendant's plea of the statute of limitations. The court found that each of the averments of the answer are not true, except certain matters stated in the findings. The findings do not in any other manner refer to the plea of the statute, and such plea is not among the excepted matters referred to in the findings. The finding is therefore to the effect that the plea of the statute of limitations is not true and is sufficient." Gale v. Bradbury, 116 Cal. 39, 47 Pac. 778.

In Spelling, New Tr. and App. Pro., section 593, the author says:

"If an issue be tendered in general terms and met by a denial in the same form, a finding in the same general form will be sufficient; but, where the pleadings are so framed that the controversy turns upon a particular fact, the finding should conform to the issue thus presented and be specific. Accordingly, when only general facts are averred, and the controversy related to the settlement of a long standing account consisting of numerous items, it was held that a general finding of a balance in favor of plaintiff was sufficient"—citing with approval the case of *Pratalongo v. Larco*, 47 Cal. 378.

The action in that case was, as stated in the opinion, "for money lent and advanced and paid, laid out, and expended by the plaintiff to and for the use of the defendant, and for money had and received by the defendant for the use of the plaintiff. The answer is a general denial and a counterclaim in which the defendant avers that the plaintiff is indebted to him for money had and received, lent and advanced, and paid, laid out, and expended." So in this case it is alleged in the answer, in general terms, that the note in question "was without consideration, and that no consideration whatever passed or was given for the promissory note." The general finding that the note was executed "for a valuable consideration received by said defendant" negatives the affirmative allegation of the answer and is therefore sufficient. Moreover, the authorities seem to hold that findings are sufficient when the facts found are stated in the same way as they are alleged in the pleadings.

In Hayne on New Trial, section 243, the rule is stated as follows:

"Facts may be stated in the findings in the same way they are stated in the pleadings. It is not necessary that the findings should follow the precise language of the pleadings; but the only purpose of findings is to answer the questions put by the pleadings, and it seems to be the received idea that it is sufficient if the answers are given in the same language as the questions, and that the two modes of statement are governed by the same general rules."

In 8 Ency. Pl. and Pr., 937, it is said:

"It is not necessary that the findings should be in the exact language of the pleadings or in any particular form. The finding complained of in this case, while of course not in the exact language of that part of the answer in which want of consideration is alleged,

nevertheless is directly responsive thereto. And, furthermore, the doctrine is elementary that the findings should be a statement of the ultimate facts in controversy and not of the evidentiary matters from which the ultimate facts are to be deduced or found." In 8 Ency. Pl. and Pr. 941, it is said: "The findings of the court should be statements of the ultimate facts only, and not probative facts. . . . The findings should contain a concise statement of the several facts found by the court from the evidence and not the evidence from which they are found."

*Murphy v. Bennett*, 68 Cal. 528, 9 Pac. 738, was an action to recover damages for the tearing down of a barn and converting the materials thereof. It was alleged in the complaint that the plaintiff was the owner of the barn at the time of the alleged conversion. The answer denied the ownership of the plaintiff and set up two affirmative defenses in justification of the taking. The court found that the plaintiff was not, and that the defendant was, the owner of the building, but omitted to find on the affirmative defenses. It was contended that the finding was a conclusion of law. On appeal the Supreme Court held that the finding on the issue of ownership was sufficient, and that the failure to find on the affirmative defenses did not prejudice the plaintiff. In the course of the opinion, the court said: "Here the allegation in the complaint is that the plaintiff 'was the owner of a certain frame building, situate,' etc. The answer denied that plaintiff was the owner of the building. Whether plaintiff did own the building or not was then the ultimate fact to be determined, and upon the issue thus raised the court found against the plaintiff. We think it clear that the findings referred to are findings of fact, and not conclusions of law."

In the case of *Kahn v. Central Smelting Co.*, 2 Utah 371, it is said in the syllabus: "A finding 'that there was no partnership between the plaintiff and the defendant' is not a conclusion of law, but is a finding of fact." And in the course of the opinion Mr. Justice Emerson, speaking for the court says: "The fact that there was a partnership is the ultimate fact alleged in the complaint. There are certain facts and conditions and circumstances

set out in the complaint from which this ultimate fact is deduced; that is, there is in the complaint much detail of mere evidentiary facts. The material issue of fact is, however: Was there a partnership? And the finding responds to this issue. This was the ultimate fact to be ascertained, and it is none the less a finding of fact because drawn as a conclusion from other facts." This case is cited with approval and the doctrine therein announced reaffirmed by this court in the case of *Snyder v. Emerson, Auditor*, 19 Utah 319, 57 Pac. 300, wherein it is held that "the finding that W. F. Critchlow was duly appointed as night jailer is not a conclusion of law, but a finding of an ultimate fact which was an issue."

As a test for determining whether the finding in question is a conclusion of law or a finding of an ultimate fact, let us suppose, for example, that the court had, in the language of the defendant's answer, found "that the promissory note signed by defendant and delivered by him to the plaintiff, as alleged in said complaint, was without consideration, and that no consideration whatever ever passed or was given for the said promissory note." Could such a finding be successfully assailed on the ground that it is a conclusion of law and not a statement of an ultimate fact? Certainly not, because it is the only finding that the court could have made had it found on this issue in favor of the defendant, and that, too, notwithstanding this issue was presented by the affirmative allegations of defendant's answer and the burden was upon him to prove that the note was executed without consideration. Now, if a finding that the note was executed without consideration would be a sufficient finding to support a judgment in favor of defendant, it necessarily follows that a finding that the note was made and delivered "for a valuable consideration" is a sufficient finding to support a judgment for plaintiff. We are clearly of the opinion that the finding made by the court is a finding of an ultimate fact, and, as we have stated, it is directly responsive to the affirmative allegations contained in the defendant's answer.

It has been suggested that the sixty-three thousand, two hundred and fifty dollars put up by Nelson and McCornick was a mere temporary advancement made by these parties to the bank to tide it over an emergency with the understanding that they would later on be reimbursed for the amount thus advanced, regardless of whether the stolen money should be recovered or the stockholders should voluntarily assess themselves to raise funds to reimburse them. As to what the understanding was in this regard is best shown by the evidence of the parties themselves. McCornick testified that the understanding was that he and Nelson would be reimbursed for the sixty-three thousand, two hundred and fifty dollars put up by them provided that the bank recovered the stolen money or the stockholders voluntarily assessed themselves to raise funds for that purpose. On cross-examination he testified in part as follows: "Q. You understood there was some sort of obligation upon the bank to reimburse you; that was, in case they recovered? A. Certainly. I have stated that many times. . . . Q. You were contracting both for yourself, then, and for the bank in what you should receive back, were you? A. I certainly contracted, if the bank got it, that we should get our money. . . . Q. Well, now I want to know whether or not there was anything said that if the money should be returned to the bank that the bank should be obligated to turn it over to you or Mr. Nelson, or any part of it? A. Certainly. It was an agreement, a verbal agreement, that it should be. . . . I believe I stated (referring to what he said to Nelson prior to and at the time the note was signed) I hoped the board of directors or stockholders might see fit to come up later and reimburse us in case it wasn't recovered. . . . I said I hoped they would, and I think he (Nelson) hoped so too. Q. You intended to submit it to the board of directors, told Mr. Nelson you expected you would submit it to them and they would likely reimburse you? A. Didn't say they would likely do it. Q. You would ask them to do it, was that said in substance? A. I don't think it was, in substance. We merely talked that we hoped that the stockholders or board of di-

rectors might do it, that the stockholders might see their way clear to reimburse us in part if not all. . . . Q. There was no agreement, however, that anything should be returned, but only in case it was returned? . . . A. Yes. . . . Well, I said, of course, . . . that the bank would reimburse us if they collected the money. Then we agreed about how it should be disbursed. He (Nelson) was to have half of his first before I received anything. . . . Q. Did you understand that you were giving to the bank fifty thousand dollars, without getting any obligation of the bank to reimburse you? A. I understand that to be the case. Q. You would never have any recourse against the bank, or any other director or stockholder? A. I wouldn't charge any director or anybody for the amount I was putting up."

Nelson, on direct examination, testified in part as follows: "Q. State what was said, if you remember it. A. It was undisputed that we should get the money back, either by finding the party who had stolen it and recover it in that way, or else we would bring the matter, when the time was proper for it, . . . before the board of directors and ask them to devise some means of putting up the money, and then, of course, I would get my money (not the note) back. Q. Was there anything said further than that? A. Well, it was questioned, of course, as to whether or not we would get all back, or part of it back, and it was agreed between us that I should get the first money that came back to the amount of one-half of that note before any division went to anybody else, as it was practically well conceded that I was putting up more than I really ought to put up." On cross-examination questions were propounded to and answered by Nelson as follows: "Q. Now, as cashier of the bank, you knew that when your note for thirteen thousand, two hundred and fifty dollars was put into the bank that it would be an asset and be so considered by the bank examiner? A. I expected that, naturally. . . . Q. What was the reason of the dispute as to how you would be reimbursed? A. Because I didn't think I should have put up so much money.

Q. Mr. Cutler decided you should? A. Yes, Also decided what should be done with anything that should be recovered. . . . Q. What did he say? What was his decision? A. His decision was that I should put up thirteen thousand, two hundred and fifty dollars, and in case the money was recovered or received from voluntary contributions I should get half of the amount of that note before any distribution was made to anybody else. . . . Q. On his decision you executed the note? A. Yes, sir."

There is nothing in the evidence given by Cutler from which it can be inferred that the sixty-three thousand, two hundred and fifty dollars paid by McCornick and Nelson was in the nature of a mere temporary advancement or loan to the bank, or that the parties so regarded it; but, on the contrary, his evidence shows conclusively that he understood the sixty-three thousand, two hundred and fifty dollars was put up by these parties to help make good the loss sustained by the bank, and that the bank was in no wise obligated to refund the money unless the stolen funds should be recovered or the stockholders should voluntarily assess themselves to raise funds to reimburse the parties. Nor is there anything in the evidence of any of the witnesses from which it can reasonably be inferred that Nelson, or any of the parties to the transaction, regarded the sixty-three thousand, two hundred and fifty dollars as a loan. Furthermore, the conduct of the parties subsequent to the transaction shows that it was not a loan, and that they did not so regard it. The note was executed January 22, 1908, and was payable "on thirty days' demand after date." As hereinbefore stated, Nelson was, at the time of the transaction, cashier of the bank. On January 31, 1908, he resigned as cashier and was on the same day, elected vice president. He served as vice president and director of the bank until April 8, 1908, when he resigned from both positions. This action was begun December 11, 1908, nearly eleven months after the note was given. During all this time no demand was made by Nelson upon the bank or any of its officers for the cancellation and return of the note.

Nor did he make any claim at the trial that there was an understanding between him, McCornick, and Cutler, either express or implied, that after the then pending crisis to the bank had passed the bank would cancel and return the note.

We now come to the decisive question in the case, namely, does the evidence introduced at the trial, when considered in the light most favorable to respondent, support the finding that the note was executed for a valuable consideration? Counsel for appellant have not discussed this feature of the case in their brief, nor have they cited any authorities in support of the assignment of error in which the question of want of consideration for the note is involved. We are, therefore, deprived of the benefit of an argument from them and whatever research they may have made on this point which involves the merits of the case. Before entering upon a discussion of the merits, we shall briefly consider what, under the authorities is held generally to be a sufficient consideration to uphold a simple contract. Section 1576, Comp. Laws Utah 1907, provides, as far as material here, that "every negotiable instrument is deemed prima facie to have been issued for a valuable consideration." Section 1577 provides, in part, as follows: "Value is any consideration sufficient to support a simple contract." In volume 2, Words and Phrases, commencing on page 1444 to and including page 1448, are collated the definitions of many text-writers and the holdings of numerous courts of last resort as to what constitutes a good "consideration" for a contract. The following are a few of the many definitions there given. On page 1445: "We can deduce the rule that if a man by a promise induces the promisee or some other person on account of or for the benefit of the promisee, to do some act, or part with some chattel, title, interest, privilege, or right, which the law regards as of some value, there is a sufficient consideration for the promise. To ascertain what the consideration of a promise is, therefore, is to discover what the promisee or such other person did or parted with on the strength of the promise. (*Rice v. Almy,* 32 Conn. 297, 303.)" On page 1446, it is said: "A sufficient

consideration for a promise arises wherever, by the act of the promisee, a benefit results to the promisor, or, at his request, to a third person, or if a promisee sustains any loss or inconvenience, or subjects himself to any charge or obligation, at the instance of the promisor, although such promisor obtains no advantage therefrom. (*Wilson v. Baptist Education Soc.,* 10 Barb. [N. Y.] 308, 313.)" "In the absence of fraud, mere inadequacy of consideration is no ground for avoiding a contract. (*Appeal of Clark* [57 Conn. 565], 19 Atl. 332, 333 [citing Smith's Lectures on Contracts] ). 'The quantum of the benefit on the one hand, or the loss on the other, is immaterial.' (*Cook v. Bradley,* 7 Conn. 57, 62, 18 Am. Dec. 79.)" "Any act done by the promisee at the request of the promisor, however trifling the loss to himself or the benefit to the promisor, is a sufficient consideration for a promise made without fraud and with full knowledge of all the circumstances. (*Doyle v. Dixon,* 97 Mass. 208, 213, 93 Am. Dec. 80; *Ballard v. Burton* [64 Vt. 387] 24 Atl. 769, 771, 16 L. R. A. 664.) A very slight advantage to one party or a trifling inconvenience to the other is a sufficient consideration to support a contract when made by a person of good capacity who is not at the time under the influence of any fraud, imposition, or mistake. (*Traphagen's Ex'r. v. Voorhees,* 44 N. J. Eq. 21, 12 Atl. 895, 901, citing *Harlan v. Harlan,* 20 Pa. 303.) In respect to the extent of the loss, trouble, or inconvenience to the promisee, it is immaterial that it is of the most trifling description, provided it be not utterly worthless in fact and law. (*Clark v. Sigourney,* 17 Conn. 511, 517.)" "A consideration to a third party may be an inducement to a person to give his note, and in such case the promise is just as binding as though the promisor had received the benefit. Where, at the time of dedicating a church, A. promised verbally to pay fifty dollars towards liquidating the indebtedness of the society and to enable it to complete its church, and thereafter, in lieu of his promise to contribute money, he gave his note for fifty dollars, payable to B., a trustee of the society, who had advanced the money for the church, B. was entitled to

recover on the note in his own name. (*Wheeler v. Toof,* 2 Mich. N. P. 44, 48.)" So, in the case at bar, the weight of evidence tends to show that it was mutually understood and agreed between McCornick and Nelson that McCornick should put up fifty thousand dollars and Nelson thirteen thousand, two hundred and fifty dollars. While the record shows that the main or principal object they had in view in coming to the rescue of the bank was to prevent a "run" on it by its depositors and to avert the ruin with which the institution was threatened, the weight of the evidence, nevertheless, tends to show that McCornick would not have put up the fifty thousand dollars if Nelson had not agreed to put up thirteen thousand, two hundred and fifty dollars. McCornick so testified, and on this point Cutler testified that McCornick told him in the presence of Nelson that he (McCornick) "was going to put up fifty thousand dollars provided Nelson put up thirteen thousand, two hundred and fifty dollars." And, as stated by counsel for respondent, in the brief, "McCornick paid fifty thousand dollars and defendant agreed to pay thirteen thousand two hundred and fifty dollars for the common purpose of making good the loss suffered by the plaintiff bank." Therefore one of the ingredients or elements of the consideration for the execution of the note was the payment of the fifty thousand dollars by McCornick for the benefit of the bank.

In *Farrow v. Turner,* 2 A. K. Marsh. (Ky.) 495, it is said:

"It is apparent from the plea (want of consideration) that it contains no defense, unless it is essential to the validity of the note, that some consideration should have moved from Shortridge to the defendant. We know of no principle of law that requires such a consideration. A valuable consideration of some sort, it will be conceded, is, under the statute of this country, essential to the validity of a note; but, if it be a consideration of value, it is totally immaterial from whom it moves. Whether it be he obligee or from any other person, it carries with it the same legal operation and communicates to the note the same validity."

In Williston's Wald's Pollock on Contracts (3d Ed.), 241, the author says:

"It is laid down in the books that consideration must move from the promisee, and it is sometimes supposed that infringement of this rule is the basis of the objection to allowing an action by a third person upon a promise made for his benefit. This is not the case. In such promises the consideration does move from the promisee, but the beneficiary who seeks to maintain an action on the promise is not the promisee. The rule that consideration must move from the promisee is somewhat technical, and in a developed system of contract law there seems no good reason why A should not be able for a consideration received from B. to make an effective promise to C. Unquestionably he may in the form of a promissory note, and the same result is generally reached in this country in the case of an ordinary simple contract."

In *Palmer Savings Bank v. Insurance Co.,* 166 Mass. 195, 44 N. E. 213, 32 L. R. A. 615, 55 Am. St. Rep. 387, it is said:

"While in this commonwealth the rule is held strictly that no one can sue or be sued on a simple contract who is not a party to it, either disclosed or undisclosed, yet it is not in all cases necessary that the consideration should move from the promisee to the promisor, in the ordinary sense of those words. . . . An assignee of a nonnegotiable debt must sue in the name of the assignor, unless the debtor has promised to pay it to the assignee; but, if there is such a promise, the assignee can sue in his own name, although no consideration for this promise moves directly from the promisee to the promisor."

In the case of *Montgomery v. Rief,* 15 Utah 495, 50 Pac.. 623, this court, speaking through Mr. Justice BARTCH, said:

"This question has been the subject of much controversy in the courts, and as a result the prevailing doctrine in this country, as shown by the weight of authority, doubtless is that, where a promise or contract has been made between two parties for the benefit of a third, an action will lie thereon at the instance and in the name of the party to be benefited, although the promise or contract was made without his knowledge and without any consideration moving from him."

This same doctrine was reaffirmed by this court in the case of *McKay v. Ward,* 20 Utah 157, 57 Pac. 1024, 46 L. R. A. 623.

In the case of *Moore v. Hubbard,* 15 Ind. App. 85, 42 N. E. 963, this identical question was involved, and in the course of the opinion the court says:

"Whether or not the consideration for the execution of the instrument sued on passed to appellant from the payee of the note, or from some one else, it would still be sufficient to sustain it if there was a valuable consideration passed to her from any one, by reason of which the instrument was executed."

In 9 Cyc. 316, the rule is stated in general terms as follows: "A benefit to a third person is a sufficient consideration for a promise." And on pages 312 and 313 of the same volume it is said: "Indeed, there is a consideration if the promisee in return for the promise does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor or not," citing cases.

We are of the opinion that the case under consideration comes clearly within the rule as declared by the foregoing authorities. Furthermore, the authorities uniformly hold that a mutual promise to contribute towards **7, 8** a common cause or undertaking is a sufficient consideration for a promise. (*Hostetter v. Hallniger*, 117 Pa. 606, 12 Atl. 741; *George v. Harris*, 4 N. H. 533, 17 Am. Dec. 446; *Congressional Society v. Perry*, 6 N. H. 164, 25 Am. Dec. 455; *Underwood v. Waldron*, 12 Mich. 90; *Rothenberger v. Glick*, 22 Ind. App. 288, 52 N. W. 811.)

In the case at bar, as we have repeatedly stated, the weight of the evidence shows that it was mutually agreed between McCornick and Nelson, each of whom was a stockholder as well as an officer of the bank, that McCornick should pay fifty thousand dollars and Nelson thirteen thousand, two hundred and fifty dollars towards making up the loss which the bank had sustained. Therefore the agreement comes within the rule governing mutual promises made by parties of contributions toward a common cause.

There was a further consideration for the execution of the note, which we think was amply sufficient to make of it a binding contract. Nelson at the time the money was stolen was cashier and custodian of the funds of the bank, and at the time he executed the note McCornick, the president of

the bank, insisted that he (Nelson) was responsible for the
entire loss, as he was cashier, and the robbery had been com-
mitted inside of the building. While Nelson protested that
he was not liable for the entire loss, he did not deny being
responsible for a part of it. In fact, the record shows that
he considered himself personally liable for at least a part
of the loss. He testified that, when McCornick asked him
to put up thirteen thousand, two hundred and fifty dollars,
he "refused to do it, saying that it was an unreasonable
amount" for him to put up, but suggested that he was willing
to put as much towards making good the loss as one of the
other officers of the bank would put up whom he seemed to
think was equally responsible with himself for the loss of
the money; that he said, quoting him literally: " 'I would
leave it to any fair-minded man what was right for me to put
up.' He (McCornick) said to me we couldn't leave it to
anybody. Didn't want it known. If we let it go out there
would be a run on the bank. I said then it should be left
to Mr. Cutler, as he was vice-president of the bank and had
been advised of the situation. . . . His (Cutler's) deci-
sion was that I should put up thirteen thousand, two hundred
and fifty dollars and in case the money was recovered, or
when any of it was recovered, or received from voluntary
contributions, I should get half of the amount of that note
before any distribution was made to any one else." And he
further testified: "Q. Any promise upon anybody's part
that you should receive any amount at all? A. No, sir.
Q. From any source? A. No, sir. Q. Now, I will ask
you whether or not following that conversation you signed
the note in question? A. Yes, I went right over there and
wrote it out and handed it to Mr. Adams." The record
shows that Mr. Adams was a vice-president and the manager
of the bank. Defendant also introduced in evidence his Ex-
hibit A, which is as follows: "January 22, 1908. Received
from Joseph Nelson thirteen thousand, two hundred and fifty
dollars to assist in making up loss of one hundred and six
thousand, two hundred and fifty dollars found missing from
the reserve safe of the Utah National Bank, said sum of

thirteen thousand, two hundred and fifty dollars is evidenced by promissory note in this bank signed by said Joseph Nelson. Utah National Bank, by W. F. Adams, V. P."

As we have hereinbefore observed, the settlement thus made with Nelson was afterwards ratified by the board of directors of the bank. It will thus be observed that Nelson's own evidence conclusively shows: (1) That before he executed the note in question he believed that he was legally liable to the bank for at least a part of the loss suffered by it because of the robbery mentioned; (2) that the president and vice president were of the same opinion; (3) that he was requested by the president to pay thirteen thousand, two hundred and fifty dollars into the bank towards making up the loss; (4) that a controversy arose between them as to the amount he should pay; (5) that the decision of this controversy was left to Mr. Cutler, the vice president of the bank, and that he decided that Nelson should pay thirteen thousand, two hundred and fifty dollars and that he (Nelson) without protest, agreed to the decision made by Cutler, and executed the note for that amount; (6) that no guaranty or promise was made to him that he should be reimbursed for the amount he put up, or any part thereof, unless the stolen money or some part thereof should be recovered, or the stockholders should voluntarily assess themselves to replace the stolen money. In the face of these facts, when considered in connection with the further fact that Nelson at the time the money was stolen was cashier of the bank and custodian of that particular fund and was in a position to know whether, in looking after and guarding this fund, he had faithfully and fully discharged every duty he, as custodian of this money, owed the bank, we do not think that this court ought to arbitrarily say that no legal liability attached to him for the loss of the money, and that there was no legal basis for the settlement he made with the bank in executing the note. We do not wish to be understood as intimating that the record justifies any inference that he had any knowledge of the robbery at the time it was committed, or that he, in the discharge of his duties as cashier,

in any way or manner acted in bad faith. Dishonesty or bad faith on his part was not essential in order to make him liable to the bank for the money stolen from its vaults. Indifference to or neglect of duty on his part in failing to use that degree of care and caution in preserving and guarding the funds of the bank that an ordinarily careful and prudent business man would use under the same or similar circumstances might make him liable to the bank for money unlawfully taken from its vaults which might have been prevented by the exercise of ordinary care on his part.

The settlement made by Nelson, on the one hand, and the president and vice president, on the other, was in effect, a compromise of whatever claim the bank had against Nelson. And the subsequent ratification of the transaction by the board of directors of the bank not only released Nelson from any and all claims that might be made against him by the bank in excess of the amount compromised for, but also obligated the bank to refund to McCornick and Nelson the respective amounts paid by them provided the money stolen should be recovered or the stockholders should voluntarily assess themselves or otherwise make good the loss. And, as stated by counsel for respondent in their brief, "the original claims of the respective parties were extinguished and the whole matter merged into the promissory note in question."

In 2 Words & Phrases, p. 1447, it is said:

"Any damage or suspension or forbearance of a right will be sufficient to sustain a promise. (2 Kent's Comm. [12th Ed.], p. 465.)" In *Burr v. Wilcox,* 13 Allen [Mass.] 273, Wells, J., in defining "consideration," says any act done at the defendant's request, and for his convenience or to the inconvenience of the plaintiff, would be sufficient. Pollock, in his work on Contracts (page 166), says "consideration" means, not so much that one party is profiting, as that the other abandons some legal right in the present. In *Boyd v. Freize,* 71 Mass. [5 Gray] 544, SHAW, C. J., says an agreement therefor to forego one's legal right, or forbear collecting a debt or enforcing any other beneficial right, is a good con-

sideration for an express promise made upon it. Such agreement may be express or implied by law. *Ballard v. Burton,* 64 Vt. 387, 24 Atl. 769, 771, 16 L. R. A. 664."

It has been suggested that, in case the judgment is affirmed and Nelson is compelled to pay the note, he could not recover from the bank the amount so paid in redemption of the note, even though the bank should succeed in recovering the stolen funds, and hence the giving of the note was without consideration. In answer to the suggestion, it is sufficient to say that one of the conditions upon which Nelson executed the note was that he would be reimbursed in case the stolen money should be recovered. We know of no rule of law that would enable the bank, after having ratified the agreement entered into for its benefit and accepted the note, to later on repudiate its obligation to reimburse Nelson in case the stolen money was recovered. No authority has been cited, nor do we think any can be found, that supports such an inequitable and unjust proposition.

Conceding, for the sake of the argument, that, as a matter of fact, no legal liability attached to Nelson for the loss of the money, yet this would not, under the facts and circumstances disclosed by the record, prevent a recovery by the bank in this action, because the undisputed evidence shows that all the parties to the original controversy, including Nelson, actually believed that he was liable to the bank for at least a portion of the money stolen, and that the compromise with respect thereto was made in good faith. Under the great weight of authority the compromise was a sufficient consideration for the note.

In Page on Contracts, section 321, the author says:

"The general rule that the legal right acquired or forborne must be a genuine one to constitute a valuable consideration must be qualified in case of compromises of disputed claims. If a *bona fide* dispute exists as to the validity of a claim, and the parties compromise such dispute by mutual agreement, such compromise is valid; as the mutual releases of rights which are at least apparent, and are upheld in good faith, form a consideration each for the other. If claims thus compromised are each genuine and upheld

in good faith, the fact that one of them is invalid does not avoid the compromise, and the validity or invalidity of the original claim is immaterial. If it were not for this rule, few, if any, compromises could be upheld"—citing cases.

In 6 Am. and Eng. Ency. Law (2d Ed.), 711, it is said:

"Closely allied with the preceding, and based upon the same general principle, is the compromise of doubtful and unliquidated claims. As it is the policy of the law to discourage litigation and to enforce voluntary settlements effected without the interposition of the law, it has uniformly been held that the compromise of dounbtful claims is valid; the mutual release of their respective rights by the parties to the controversy, and the avoidance of the expense and annoyance of a suit at law, being a sufficient consideration for the composition." And on page 714 of the same volume it is said: "After a compromise has been entered into in good faith, in an action to enforce the satisfaction, the merits of the original controversy cannot be called into question."

In 8. Cyc. 510, the rule is stated as follows:

"The law favors the avoidance or settlement of litigation, and compromises in good faith for such purposes will be sustained as based upon a sufficient consideration, without regard to the merits of the controversy or the character or validity of the claims of the parties, or even though a subsequent judicial decision may show the rights of the parties to have been different from what they at the time supposed. The real consideration which each party receives under such a compromise is, according to some authorities, not the sacrifice of the right, but the settlement of the dispute."

(*Perkins v. Trinka,* 30 Minn. 241, 15 N. W. 115; *Armijo v. Henry,* 14 N. M. 181, 89 Pac. 305, 25 L. R. A. (N. S.) 275, and cases cited in note.)

Moreover, Nelson, on cross-examination, testified that the payment of the fifty thousand dollars by McCornick "added twenty-five dollars a share to the assets of the bank." At the time of the compromise he owned fifty shares of the stock, which, according to his own testimony, was enhanced twelve-hundred and fifty dollars in value by McCornick's performance of his part of the agreement. Besides, the payment made by Nelson and McCornick saved the bank from a probable "run" and unquestionably saved it from being closed

by the Comptroller of the Currency.  Therefore it may be fairly said that a  valuable consideration in  effect moved from McCornick to the defendant for the execution of the note.  True, Nelson testified that when he signed the note he did not intend to pay it, but his own evidence as to what was said and done on that occasion, when considered in connection with the testimony of McCornick and Cutler, shows that he executed the note in good faith, and that at the time he did so fully intended to pay it.

The claim made by Nelson that, at the time he signed the note and delivered it to the bank, he had no intention of every paying it, was an afterthought on his part.  This is shown by his own evidence, which we have hereinbefore set out.  We also invite attention to the following statements made by him on cross-examination: "Q. You told your counsel that at first you refused to put up this note . . . for thirteen thousand, two hundred and fifty dollars?  A. Yes, sir.  Q. When was it you changed your mind and concluded to put it up?  A. When Mr. Cutler said that would be fair.  Q. Was it right then you had in mind that you would not pay it?  A. I never expected to have to pay it, expected it would be collected some other way.  Q. If it was not collected some other way, did not have it in mind then you would not pay it?  A. Quite sure it would be collected; never had any other thought.  Q. Did you have in mind then you would not pay this note if the money was not found?  A. Never thought of it from that standpoint at all."

Furthermore, if the note was not delivered to and accepted by the bank in good faith as an asset, and the entry made of it in the books of the bank was only for the purpose of deceiving the federal bank examiner or the officers of the bank who were not advised of the robbery mentioned, then it follows that under section 5209, Rev. St. U. S. 1878 (U. S. Comp. St. 1901, p. 3497), the entry of the note as an asset on the books of the bank was a "false entry," and every person who was a party to the fraudulent transaction, know-

ing it to be such, could be prosecuted criminally under said section. We are not, therefore, prepared to hold, on the bare assertion of Nelson, which assertion he, in giving his testimony, repeatedly contradicted, and which is inconsistent with the admitted facts leading up to and surrounding the transaction, that the note was given by Nelson and accepted by the bank and used only as a dummy to deceive the federal bank examiner and all other persons who were not parties to the transaction and who were doing or might thereafter do business with the bank. Moreover, it is a familiar rule of law that, where a transaction is explainable upon either of two different theories, one of which is consistent with good faith and fair dealing and the other involves fraud and deception, the explanation consistent with honesty and legality will be accepted unless the evidence clearly preponderates in favor of the illegal aspect of the transaction. In 1 Jones on Evidence this principle is aptly illustrated in the following language: "In the ordinary transactions of life, fairness and honesty are presumed, and conveyances, sales, and contracts generally are presumed to have been made in good faith until the contrary appears. . . . In actions involving fraud, as in other cases where the facts present a double aspect, one consistent with fair dealing and the other involving dishonesty of purpose, the court, unless the scale decidedly preponderates for the latter, will strike the balance in favor of honesty and innocence." (16 Cyc. 1082.)

In this case the undisputed facts, as we view them, are not only consistent with good faith and honesty of purpose on the part of Nelson, McCornick, and Cutler in entering into the agreement by which the credit and financial standing of respondent bank was maintained, but are inconsistent with any other conclusion. It is conceded that it was understood and agreed between Nelson, McCornick, and Cutler at the time the note was executed that in case any of the money stolen should be recovered by the bank, or the loss made good by voluntary assessments on the part of the stockholders. Nelson should be paid one-half of the thirteen thou-

sand, two hundred and fifty dollars put up by him before McCornick should be reimbursed for any of the fifty thousand dollars put up by him. Now, Nelson, knew that if, for any reason, he should fail to pay the note, there would be nothing due him under this part of the agreement, even though the money stolen should be recovered or the loss otherwise made good. It is not reasonable to suppose that if he, at the time he executed the note, intended to repudiate it later on, he would have insisted upon the parties with whom he transacted the business entering into this part of the agreement. In fact, the great weight of the evidence shows that the basis upon which McCornick and Nelson should be reimbursed in case the money stolen or any part of it should be recovered was the only question about which there was any serious controversy. The question, however, as to what Nelson's real intentions were in regard to the matter at the time he signed the note is unimportant, as the evidence, without conflict, shows that the parties with whom he transacted the business acted in good faith, and at the time had every reason to believe, and no doubt did believe, that he, too, was acting in good faith.

Counsel for appellant next contend that, as there was no evidence introduced as to the amount of attorney's fees actually charged by respondent's attorneys for their services in conducting the case "which had been paid or was to be paid" to them by respondent for such services, the court erred in allowing and including in the judgment the attorney's fees provided for in the note. Counsel in their printed brief say: "The allegations contained in the complaint . . . with reference to attorney's fees are all true and were therefore admitted in defendant's answer, and no issue upon such fact was raised, and of course no evidence introduced." Counsel do not contend that the fee provided for in the note and allowed by the court was unreasonable or in any respect unjust. What they claim is that it was incumbent upon plaintiff to prove not only the reasonableness of the fee, but that the amount was actually charged and paid or agreed to be paid by respondent to the attorneys for their services in

conducting the case. And in support of their contention they cite and rely upon section 3504, Comp. Laws, 1907, which, so far as material here, provides: "In all cases of foreclosure, when an attorney or counsel fee is claimed by the plaintiff no other or greater amount shall be allowed or decreed than the sum which shall appear by the evidence to be actually charged by and to be paid to the attorney." Section 3505 provides: "In all cases of foreclosure by proceedings in court the attorney's fee shall be fixed by the court in which the proceedings of foreclosure are had, any stipulation in said mortgage to the contrary notwithstanding." The language of these provisions of the statute is both plain and specific and clearly shows that the provisions providing for certain proof in regard to attorney's fees apply to foreclosure proceedings only. By an examination of the entire act of which the sections of the statute just quoted form a part, it will be seen that it relates exclusively to foreclosure proceedings, and that it neither expressly nor by implication refers to or deals with any other subject. Nor do any of the provisions of the negotiable instruments act in any way relate to or deal with actions of foreclosure. The two statutes are not in *pari materia,* as they in no sense relate to the same general subject-matter.

The case of *McCornick v. Swem,* 36 Utah 6, 102 Pac. 626, recently decided by this court, was an action to recover on a promissory note that contained a stipulation for an attorney's fee. Plaintiff obtained a judgment in which attorney's fees were allowed. On appeal the judgment was assailed on the ground that there was no evidence to show that the plaintiff paid or was required to pay an attorney's fee. In disposing of the question, Mr. Justice FRICK, in a carefully prepared opinion, speaking for the court, says:

"It has frequently been held that, even when the amount has been agreed upon, it is, nevertheless, subject to control by the court; and therefore, if it appears to the court that the amount agreed upon is unfair, unjust, or unreasonable, the court should permit a recovery only for what is reasonable under all the circumstances, the same as where no amount has been agreed upon. It

seems to us, however, and quite a number of courts so hold, that prima facie the amount agreed upon should be assumed as the proper fee to be allowed, and unless it is clearly obvious to the court, or is made to appear, that the amount stipulated for is unjust, oppressive, or unreasonable, in view of all the circumstances of the case, the stipulated amount should be allowed"—citing authorities.

As no claim is made that the amount allowed as attorney's fees is unreasonable, this assignment must be overruled, as the case of *McCornick v. Swem,* is decisive of the question.

Judgment affirmed, with costs to respondent.

FRICK, J. (concurring).

I concur with Mr. Justice McCARTY, and shall briefly state the principal reasons that have impelled me to arrive at such a conclusion.

The contention that the ultimate fact of what constituted the consideration for the note sued on was not found, in view of the facts and circumstances of this case, is, in my judgment, without merit. The action was founded on a negotiable instrument. The only defense interposed, and this in general terms merely, was want of consideration. The material contested issue, and the only one that required judicial determination, was whether the note was based upon a sufficient consideration. The following facts and inferences or deduction which induced the execution and delivery of the note in question are undisputed, namely, that the sum of one hundred and six thousand, two hundred and fifty dollars had been, in some way, abstracted from the bank; that by reason thereof the necessary banking capital was impaired; that this impairment, if known, might, and probably would, induce a run on the bank by its depositors, and thus the bank's existence would be threatened, if not destroyed; that both the appellant and Mr. Cornick were not only interested in the bank as officers, but they had a direct pecuniary interest in maintaining its financial integrity; that by adding at once the sum of sixty-three thousand, two hundred and fifty dollars to the banking capital, of which amount the note in

question represented thirteen thousand, two hundred and fifty dollars, the amount required by law would be restored, the financial integrity of the bank maintained, and in all probability the bank would continue in business as before and all interest therein would be kept intact. The question whether, from these facts and inferences or deductions, a court was authorized to find that the note was founded upon a sufficient consideration, was therefore in the nature of a legal conclusion rather than a finding of fact with regard to what constituted the consideration for the note.

Generally speaking, as Mr. Blackstone says, "this thing, which is the price or motive of the contract, we call the consideration." (Cooley's Blackstone [3d Ed.], bottom p. 586.) From the foregoing facts the motive of McCornick and appellant that induced the payment of fifty thousand dollars by the one and the making and delivery of the note by the other is so palpable that it requires no discussion. Maintaining the financial integrity of the bank and preventing the probability of a run thereon by the depositors, and in that way preserving intact the interests of both McCornick and appellant, to my mind, constituted ample consideration to support the appellant's promise to pay. Under such circumstances, the court, therefore, could only have found the facts out of which the actual consideration arose or sprang. These facts, as I have shown, were not in dispute, and hence nothing was really necessary for the court to do save to declare the legal deduction from the conceded facts. This, in legal effect, is just what the court did.

It may be that, if the appellant had requested specific findings with respect to the facts which I have detailed, the court would have made them; but, even if the court had not done so, I cannot see in what way the appellant has been prejudiced in any substantial right. The error, if any, in view of the circumstances, would, at most, have been technical and not substantial. This court should not reverse cases unless a substantial right of the complaining party has either been disregarded or invaded. In my judgment ap-

pellant has shown no cause whatever why the judgment should be reversed.

The suggestion that the transaction between McCornick and appellant in legal effect amounted to no more than if A. had agreed with B. that A. would advance D. a certain sum of money if B. would also advance D. a certain sum, and that, if A. complied with his promise but B. failed to do so, therefore D. could not enforce B.'s promise, in my judgment, reflects neither the facts nor the circumstances of this case. Let me state a case which, in my judgment, is nearer like the case in hand. Suppose A. and B. are creditors of D., and suppose further that, because of a sudden and unlooked for loss of a large sum of money, D. is threatened with bankruptcy unless he can obtain a certain sum of money from some source with which to maintain his financial integrity and to prevent his creditors from forcing a sale at ruinous prices of his property and assets. Suppose, now, that A., under such circumstances, proposes to B. that, in order to maintain D.'s financial integrity and to preserve his business from ruin, and in that way also to preserve intact A.'s and B.'s interests as creditors of D., that A. would pay to D. a certain sum of money if B. would likewise do so, and suppose further that B. promised that he would pay a certain sum of money to D. for the purposes aforesaid, and, upon A.'s paying the amount he promised to D., B. executes a negotiable note payable to D. and delivers the same to him, and D. uses the same for the intended purpose, and by reason of what A. paid and by virtue of B.'s note D. actually maintains his financial integrity, preserves his business, and is thus enabled, if necessary, to repay his creditors, including both A. and B., in full, would not B.'s note be based upon a valuable consideration and be enforceable by D. in a court of law? In my judgment there is but one possible answer to the foregoing, which is that B.'s promise is enforceable; nor would the fact that A. and B. in the supposed case did not in terms state the entire motive or motives that induced them to act, provided the facts are present and the parties are induced to act upon such facts.

In this connection may also be considered the contention that appellant's promise to pay the money expressed in the note was conditional merely. In my judgment the promise to pay by appellant was absolute and without any condition whatever. The only matter, as I understand the evidence, that was left conditional, was the repayment of the money to appellant and McCornick. If the amount of money abstracted from the bank was recovered, or if made good by the voluntary acts of the stockholders, then appellant was to be repaid one-half of the amount he agreed to pay before McCornick should receive any of the amount he paid. It was, however, quite well understood between appellant and McCornick that, in order to preserve the integrity of the bank's working capital, the amount of money agreed to be paid by each was to be a part of the assets of the bank absolutely and unconditionally. This was accomplished when McCornick paid the fifty thousand dollars into the bank and appellant executed and delivered to it his promissory note, which was intended to be and was made a part of the bank's available assets. All that the parties intended to accomplish was thus accomplished. The bank's impaired capital was made good; the possible consequences of a run on the bank were averted. The results sought after were not only legal, but were laudable, and in the end profitable not only to the bank as a corporate entity, but in a measure likewise to both McCornick and appellant.

Whether appellant shall hereafter be made whole if the lost money be recovered, or if the stockholders shall replace it by a voluntary assessment, is, however, merely collateral to the main issue, and is of no importance now. So long as appellant's unconditional promise to pay, which, as I have shown, is based upon a sufficient legal consideration, remains unfulfilled, so long he is in default, and can and ought to be required to redeem that promise.

In my judgment appellant has utterly failed to show that the judgment is erroneous, illegal, or unjust, and hence it ought to be affirmed.

STRAUP, C. J. (dissenting).

I dissent. The facts, in brief, are: The capital stock of the bank was two thousand shares of the par value of one hundred dollars each. W. S. McCornick, the president, owned a little more than fifty per cent of the stock. The defendant, the cashier, owned fifty shares. The remaining shares of stock were owned by various other individuals. On the 12th day of January, 1908, one hundred and six thousand, two hundred and fifty dollars of the reserve fund of the bank was found missing. The president asserted to the cashier that he "considered him responsible for the loss, being the custodian of that particular fund and having the combination to the reserve chest." No claim is made that the cashier took the money, or that he had anything to do with the taking of it, nor that the money was lost through his negligence; nor did the president accuse him of such, or any, wrongful conduct. He merely asserted to the cashier that he thought he was responsible for the loss because he was the cashier and had the combination to the reserve chest. Such responsibility was denied by the cashier. According to the testimony of the president, who was the principal witness for the plaintiff, he made a proposition to the cashier that he would pay to the bank fifty thousand dollars if the cashier would pay thirteen thousand, two hundred and fifty dollars. Such payments, together with forty-three thousand dollars of undivided profits, would make an amount equal to one hundred and six thousand, two hundred and fifty dollars, the amount found missing. The cashier at first declined to pay such an amount. He was willing to pay only an amount equal to what his proportionate share would have been had an assessment been levied on all of the stock. The president asserted that the fact of the loss could not then be made known to the directors, nor to the stosckholders, without causing a run on the bank. They further discussed the question as to how they should be reimbursed in the event that the president paid the fifty thousand dollars and the cashier thirteen thousand, two hundred and fifty dollars. The latter insisted that he should be paid in full before the

president should be paid anything. The president did not agree to that. They then decided to refer the matter to Mr. T. R. Cutler, the vice president. Mr. Cutler, also a witness for the plaintiff, testified: "I did not feel that I was called upon to decide the payment of the thirteen thousand, two hundred and fifty dollars. That seemed to be fixed between the two of them, what should be paid. It was the question with me, that I was left to decide, as to whether Mr. Nelson should receive thirteen thousand, two hundred and fifty dollars provided they recovered any of the money— either recovered it from the robbers or thieves, or any assessment that might be levied." After several conferences with both of them, the vice president decided that the cashier should receive one-half of the thirteen thousand, two hundred and fifty dollars before the president received anything. Thereupon the president, on the 22d day of January, 1908, paid to the bank fifty thousand dollars, and the cashier gave his note for thirteen thousand, two hundred and fifty dollars payable in thirty days. He refused to pay the note when it became due, whereupon this action was brought on the 11th day of December, 1908. In his answer the cashier admitted the execution of the note and pleaded want of consideration. That was the only issue tried. The plaintiff introduced the note in evidence and rested. The defendant gave testimony tending to show that the note was given without consideration.

Upon the evidence thereafter adduced by plaintiff, it claims that "three distinct valuable considerations" were shown: (1) That the contention made by the president to the cashier that the latter was responsible for the loss, because he was the cashier and had the combination to the reserve chest, and the cashier's denial of such responsibility, constituted a settlement of a disputed and unadjusted claim; (2) that the promise of the president to pay to the bank fifty thousand dollars upon the cashier's promise to pay thirteen thousand, two hundred and fifty dollars also constituted a sufficient consideration, within "the rule that a subscription of one individual to a common cause is sup-

ported by the subscription of others to the same cause;" (3) that the president of the bank suffered a detriment by making the payment of fifty thousand dollars, and that such payment inured to the benefit of the defendant by increasing the value of the capital stock of the bank. Upon these matters considerable evidence was given by both parties. The trial lasted a day. When the court made findings, it merely found that the note was given "for a valuable consideration." Appellant urges that the ultimate fact of consideration was not found, and that the evidence is insufficient to show a good or valuable consideration. I think the appellant is entitled to prevail on both contentions.

We are told that all that was required to be alleged in the complaint with respect to the consideration was that the note was executed and delivered for "a valuable consideration," and that a finding in such language was all that was required. In particular cases courts have said that findings of ultimate facts in the language of the complaint was all that was necessary, when the allegations were not themselves open to the objection that they are statements of conclusions and not ultimate facts. The language so used was proper enough as applied to the particular cases in which it was employed, but such language should not be made so flexible and general as to apply to all cases. The court was required to clearly and specifically find the ultimate facts as established by the testimony and put in issue by the pleadings. It might well be that in a large majority of cases findings of ultimate facts in the language of pleadings is quite sufficient. But what is the situation here? The court tried but one issue. It consumed a day in hearing and receiving evidence upon the subject of consideration. Upon such evidence adduced the plaintiff contends that "three distinct valuable considerations" were shown. But all the court found upon the subject is that the note was given for a "valuable consideration." Such a finding gives no more enlightenment as to the ultimate facts found, and upon which the court heard evidence for a day, than if the court had made a finding that he "found the issue" in favor of the

plaintiff. It cannot be ascertained whether the court found that a settlement was made of a disputed and unadjusted claim, as contended for by the plaintiff, and that such settlement constituted the consideration for the note, or whether the court found that the defendant promised to pay to the bank thirteen thousand, two hundred and fifty dollars in the event that the president paid fifty thousand dollars, and that such mutual promises constituted the consideration, or whether the court found that the payment of fifty thousand dollars to the bank by the president was a detriment to him or a benefit to the defendant. The finding is not unlike a case where upon a plea of want of consideration the plaintiff contended that the note was given as the result of a transaction had with the defendant wherein the plaintiff claimed that he loaned money to the defendant, rendered services at his request, and sold and delivered goods to him, and that each and all constitute a good and valuable consideration for the note, and after several days spent in the trial of such matters, in which the plaintiff gave evidence tending to support all three claims, and the defendant denying them, the court merely found that the note was given "for a valuable consideration." Upon such a finding it could not be ascertained whether the court found the ultimate fact that the plaintiff loaned money to the defendant, or rendered services for him, or sold and delivered goods to him. There, as here, the reviewing court is compelled to review the whole case and make its own findings with respect to the consideration, which, in a law case, we are not permitted to do. Though not intended, and expressly disclaimed, yet that is what I think has been done here.

Aside from this, I also am of the opinion that no sufficient facts are shown to constitute a good or valuable consideration. The first contention made is that the note was given in settlement of a disputed and unadjusted claim of one hundred and six thousand, two hundred and fifty dollars, which the president asserted against the defendant. I do not find any evidence to support such a contention. The only witnesses who testified in respect of such a subject were

the president and the defendant.    The former testified:
"Q.   Was there any agreement made between you and Mr.
Nelson that the giving of the thirteen thousand, two hundred
and fifty dollars, that his part could settle his obligation
for the one hundred and six thousand, two hundred and fifty
dollars?   A.   Any agreement?   Q.   Yes.   Was there any-
thing said to that effect?   I will add that to the question.
A.   I don't hardly understand the question.   Q.   Did you
say to Mr. Nelson that if he would give the thirteen hundred,
two hundred and fifty dollars that that would settle his obli-
gation for the one hundred and six thousand, two hundred
and fifty dollars, which had been taken and which you said
he was responsible for?   A.   No, I don't think I said that.
Q.   Did not say that, nothing to that effect?   A.   No.   Q.
If there was anything said whereby such an arrangement—
from which such an arrangement could be drawn that you
recollect?   A.   Nothing that I can recall."   The defendant
testified as follows:   "Q.   Wasn't the reason that you paid
more (than the president in proportion to the stock owned by
them) this:   That McCornick, in substance, said to you, you
are liable for the one hundred and six thousand, two hun-
dred and fifty dollars, because you are the cashier, were
the cashier when this money was lost, you were custodian
of it; therefore you should pay more in proportion than me?
A.   No, sir.   That was not the reason.   Q.   Did he say that
to you?   A.   He may have done.   Q.   Do you remember
it?   A.   No, sir; I do not.   In fact, I don't believe he said
it."

    This is all the evidence on such subject.   While the presi-
dent testified that he told the defendant that he thought he
was responsible for the loss because he was the cashier, and
the defendant testified that he "don't believe he said it,"
yet both testified that the note was not given for any such
purpose.    Furthermore, there is no evidence to show that
the defendant had anything to do with the taking of the miss-
ing funds, or that the loss was in any manner occasioned
through his negligence, fault, or conduct.    The president
did not accuse him of any such things.    Nor upon the record

is there any claim made that he took the money, or that it was lost through his negligence or other conduct. The only accusation made, and that by the president, was that the defendant, by virtue of his position as cashier and the custodian of the fund, was responsible for the loss no matter how it was occasioned, whether by robbers or otherwise. But, whatever the president or the defendant may have thought of such a remarkable and unfounded contention of liability of a cashier of a bank, both of them testified that the note was not given in settlement of such supposed or any other obligation.

A further contention is made by plaintiff that McCormick's promise to pay fifty thousand dollars to the bank was a sufficient consideration for the defendant's promise in the note to pay thirteen thousand, two hundred and fifty dollars. I pass without considering the question of inconsistency of the contentions, or of plaintiff's right to shift its claim with respect to the consideration from one thing to another, and its final summary of claiming "three distinct valuable considerations" for the note. After the defendant gave testimony tending to show that the note was given without consideration, it would seem that the plaintiff ought to have had some reasonably well-defined idea what the note was given for. It is not enough that it points to several or a number of things which, singly or collectively, might have constituted a sufficient consideration. The president of the bank testified that he said to the cashier that he would pay fifty thousand dollars to the bank if the defendant paid thirteen thousand, two hundred and fifty dollars. This was denied by the defendant. But in determining the question in hand I take the evidence which makes most strongly for the plaintiff, and therefore I assume such fact to be as testified to by the president. I readily concur in the rule, as contended for by the plaintiff, that, "when several agree to contribute to a common object which they wish to accomplish, the promise of each is a good consideration for the promise of the others." But I find no evidence rendering the rule applicable. I think it clear, upon plaintiff's evidence, that the de-

fendant did not agree to pay thirteen thousand, two hundred
and fifty dollars, or to give his note, as a mere donation, or
gift, or contribution; but that he was in some way to be
reimbursed for or repaid the money to be paid by him to the
bank. Neither did McCornick agree to contribute or donate
or pay the fifty thousand dollars to the bank without any
understanding or expectation that he was in some way to be
reimbursed or paid back. The very thing about which the
president and the cashier most disagreed in their contentions
was the division of the money when refunded by the bank;
the cashier contending that he should receive all of his money
before the president received any, and they finally agreeing
to leave such question to the vice president.

Upon this subject the president testified: "Should any-
thing be returned of that amount stolen, or an assessment
on the stock of the bank, any way that money got back, he
(Nelson) wanted to get the whole of his amount first, in case
there wasn't enough to pay it all back he should get his first.
That we agreed to leave to Mr. Cutler. Q. Now, Mr. Mc-
Cornick, I understand, then, that the arrangement between
you and Mr. Nelson, in case the bank levied an assessment
and returned anything to you and Mr. Nelson, that you
should divide it in given proportions. That was your con-
versation, was it? A. Well, as I say, he wanted the whole
of his first. Q. You finally decided that he should get half
of his first? A. Bishop Cutler did, and we agreed to that.
Q. Yes? A. Yes, we agreed. Q. So you can understand
my question, I will repeat it: The conversation was to the
effect that, in case the bank returned anything to you or Mr.
Nelson because of having put in this sixty-three thousand,
two hundred and fifty dollars, he should get half of what
he put in before you took anything personally? A. That's
right."

True, he further testified that there was no binding agree-
ment made with the bank that anything should be returned,
but he all the time asserted to the cashier and to the vice
president that he could not then let the board of directors

38 Utah—14

know of the loss without causing a run on the bank. He repeatedly testified that the money to be paid by him and the cashier was to be returned in case the lost money was recovered, and further also testified: "I certainly thought, expected, that the bank would reimburse us. . . . I was acting as president of the bank. I was president of the bank. As far as my authority went, it was binding on the bank. . . . . I didn't enter into any writings with the bank. Q. It (the money paid by the president) was not intended to be a gift to the bank? A. Well, the money that was stolen was not a gift. That's one thing certain. Q. Mr. McCornick, I just want a clear answer to the question. I have reference to the fifty thousand dollars which you gave. You say you thought and intended in these negotiations that the bank should at least reimburse you and Mr. Nelson to the extent of the moneys they recovered of that which was stolen? A. Well, I testified to that many times. That is the intention and expectation, that we would be reimburse in case the bank ever recovered any of this money. Q. You never intended to give it to the bank? A. Didn't give it if they ever got it back. Q. You understood there was some sort of an obligation upon the bank to reimburse you, that was in case they recovered? A. Certainly. I have said that many times. Q. Didn't you state to Mr. Nelson, wasn't it the understanding that, inasmuch as you and he had stepped into the breach at a time when the loss could not be made public, you would submit the matter to the board of directors with the idea of having them reimburse you by assessment or otherwise? A. No, I don't think I said it in them words. Q. What were the words you said? A. Believe I stated I hoped the board of directors or stockholders might see fit to come up later and reimburse us in case they didn't recover. Q. That's what I am getting at. So there was something said between you and Mr. Nelson? A. I said I hoped they would, and I think he hoped so too. . . . We merely talked that we hoped that the stockholders or board of directors might do it, that the stockholders might see their way clear to reimburse us in part if not all. . . . And that the stock-

holders might, in the future, see thir way clear to stand their portion pro rata of this loss in part, if not all."

The cashier testified that "Mr. McCornick promised me he would call the stockholders, or board rather, together as soon as the time was prudent to submit it to them, and he thought they would be willing to put up their pro rata."

Had McCornick and the defendant agreed that the former should contribute or donate or pay to the bank permanently or unconditionally fifty thousand dollars and the latter thirteen thousand, two hundred and fifty dollars, with no understanding either expressed or implied that neither was to be reimbursed or paid back, or that the bank or the directors or stockholders were in no manner to account to them for the money so paid, the rule invoked by plaintiff might be applied. I however, find no evidence to justify such a finding. Nor is it claimed by the plaintiff that the fifty thousand dollars paid by McCornick was paid, nor that the note given by the defendant was given under such circumstances. No such position was taken by the plaintiff in the court below, nor is such a position urged here. The position taken and urged by it is that, inasmuch as the fact of the loss could not then be made known to the board of directors or the stockholders without making the loss public and occasioning a run on the bank, McCornick agreed to put into the bank fifty thousand dollars in consideration of defendant's paying thirteen thousand, two hundred and fifty dollars. When both the defendant and the vice president urged that the matter be submitted to the directors for their action to devise means to replenish the lost funds by the levying of an assessment, upon all the stock, or otherwise, the president persistently objected to such action at such time upon the only ground that to then submit the matter to the board would make the loss public and create a run on the bank. It is very clear to me, and I think the only conclusion permissible from the record is, that to tide the bank through an emergency until such time when the board could safely deal with the matter the president agreed to advance or pay to the bank fifty thousand dollars for its temporary

use and benefit in the event that the defendant paid thirteen thousand, two hundred and fifty dollars for a like purpose. That, I think, is the most that can be properly claimed for plaintiff's evidence. I do not find anything in the record to warrant the conclusion that the fifty thousand dollars paid by McCornick, or that the thirteen thousand, two hundred and fifty dollars agreed to be paid by the defendant, was to be a permanent fund of the bank in the sense that neither it nor the board, or stockholders, were in no manner to account for such payments. And how unreasonable and unbusinesslike it is to suppose that the president of the bank, wholly innocent and blameless of the loss and in no sense responsible for it, should pay fifty thousand dollars for the permanent use and benefit of the bank and of its stockholders with no expectation or understanding that he was in some way to be reimbursed or repaid. At any rate, under the evidence it is very clear that neither McCornick nor the defendant, when the latter promised to pay the bank thirteen thousand, two hundred and fifty dollars, intended that such payment should be absolute and unconditional and as and for a permanent fund of the bank. So, upon the evidence viewed in the light most favorable for the plaintiff, the most that can be legitimately claimed for it is that McCornick agreed to pay to the bank for its temporary use and benefit, to advance or lend to it, fifty thousand dollars, in the event that the defendant paid thirteen thousand, two hundred and fifty dollars for a like purpose. Now, that is a good contract founded upon a sufficient consideration for an agreement to lend or advance money, but not to support the promise contained in the note to pay thirteen thousand, two hundred and fifty dollars absolutely and unconditionally, nor to entitle the beneficiary for whose benefit the money was promised to demand or claim the money absolutely and permanently, as the plaintiff necessarily does in this action. Had the defendant 'paid the thirteen thousand, two hundred and fifty dollars to the bank, under the circumstances disclosed by plaintiff's evidence, the law undoubtedly would have implied an agreement to pay it back or to reimburse him, for the

evidence is most positive and direct that the payment promised by him was not intended as a gift or permanent payment, but that he was in some manner to be repaid or reimbursed. As I view the situation, it is this: A. agrees to advance and lend to D. a certain sum of money if B. will also advance and lend to D. a certain sum. A. performs the agreement and advances the money. B. fails. Now, depending upon circumstances, I can see how D. might have legal cause for complaint against B. for damages on account of his breach, but I do not understand upon what principle of law he could properly sue B. to recover the promised money absolutely, unconditionally, and permanently. It may, however, be said that the defendant here, when he executed the note, promised to pay absolutely and unconditionally. So he did. But it was not that promise which was made to McCornick. It was not that promise upon which McCornick agreed to pay nor paid the fifty thousand dollars. He testified that in his conversations and negotiations with the defendant nothing was said about the defendant giving his note; that he understood that the defendant was to pay in cash, in effect, not for a permanent but temporary use of the bank, as I have heretofore shown; and that he had no knowledge that the defendant had given his note until after McCornick had paid the fifty thousand dollars.

There being a total want of evidence that McCornick promised to pay, or that he paid, fifty thousand dollars unconditionally, and as a permanent fund, or that he promised to pay, or paid, the fifty thousand dollars upon any promise or understanding that the defendant was to pay thirteen thousand, two hundred and fifty dollars unconditionally and as and for a permanent fund, and the evidence as I view it conclusively showing the contrary, I think no consideration is shown to support the defendant's promise contained in the note to so pay absolutely and unconditionally and as and for a permanent fund. Upon the evidence adduced, and upon the transaction as shown by the record, I do not see anything, in case McCornick should not be repaid or reimbursed, to prevent his recovering for money had and received, or

maintaining some appropriate action seeking to be reimbursed. But how about this defendant, upon an affirmance of the judgment below which gives the plaintiff an unconditional and specific judgment against the defendant for a sum certain and the right to an execution to enforce it absolutely the same as any other absolute and unconditional money judgment? And if upon the remittitur to the court below the judgment is satisfied by him, either voluntarily or by execution, I do not now see what claim he may thereafter successfully assert, either against the bank or his associate stockholders, for reimbursement or contribution. It would seem that the adjudication that the promise contained in the note to pay absolutely and without conditions was founded upon a sufficient consideration, and the affirmance of the judgment without conditions or limitations of any kind would be a complete bar to any claim or demand which the defendant might thereafter assert against the bank for money had and received, or to be repaid or reimbursed, even though the bank should recover every dollar of the lost fund from the wrongful taker. In other words, upon the record viewed in the light most favorable for the plaintiff, it indisputably is made to appear that the defendant promised to pay a certain sum of money to the bank upon conditions of repayment or reimbursement, yet a money judgment of absolute and unconditional payment of such sum is entered against him which bars him from hereafter asserting any claim of repayment because he gave the note, instead of paying the promised money in cash. Upon the evidence adduced by the plaintiff, it is evident to me that, had the defendant paid the money instead of giving the note, he would have been entitled to have it repaid, or to be reimbursed. And it is just as evident to me, had he not paid it, and had the bank sued to recover it from him, on the promise and agreement as testified to by plaintiff's witnesses, the promise and agreement which it is contended constitutes the real consideration for the note, the action would have been unsuccessful, for the obligation or promise, as testified to, to pay upon an understanding of repayment, or reimbursement, would have been

dissolved by the implied obligation to pay back or to reimburse him. For the law would not do so idle a thing as to compel an alleged obligor to pay money when upon such payment he could on demand legally require repayment of it. And, at all events, the law should not compel an obligor to pay money absolutely and unconditionally when on the actual transaction, as had between the parties he only promised and agreed to pay it on conditions of reimbursement or repayment.

Some importance is also attached to plaintiff's contention that the defendant received some benefit from McCornick's payment of fifty thousand dollars to the bank which it is claimed prevented a run on the bank and increased the value of the capital stock of the bank, and therefore the defendant should now be compelled to permanently and unconditionally pay thirteen thousand, two hundred and fifty dollars to the bank, when, according to all the evidence, McCornick did not agree to pay, nor did he pay, the fifty thousand dollars upon any such understanding or promise that the defendant was to so pay unconditionally and permanently. The claim further becomes untenable, as it seems to me, when it is understood that what McCornick in fact did was not to pay fifty thousand dollars to the bank as and for a permanent fund and to make the bank or his associate stockholders a gift or permanent contribution of fifty thousand dollars, but merely advanced such sum to the bank until such time when the board of directors or stockholders could safely deal with the question of replenishing the lost fund, and of devising some means to repay or reimburse him, as he, the president and the owner of the majority of the capital stock testified he thought and expected the bank, or directors, or stockholders would do.

My conclusion that the money paid by McCornick and that promised to be paid by the defendant was paid and promised not as a permanent fund of the bank, but upon conditions of repayment or reimbursement, is questioned. On that point the defendant testified: "It was undisputed that we would get the money back, either by finding the party who had stolen it and recovering it in that way, or

else we would bring the matter, when the time was proper for it, before the board and ask them to devise means of putting up the money, and then, of course, I would get my money back." McCornick, in addition to portions of his testimony already referred to, testified as follows: "Q. Mr. McCornick, these preliminary negotiations, or this final meeting you had in the presence of Mr. Cutler, you testified in reference to, you stated, did you not, that the board would subsequently be called together at the proper time, and what you and Mr. Nelson had done would be submitted to the board, did you not? A. You ask if I stated that? Q. Yes; I will ask you if you did say it? A. Well, I think maybe I did. If I didn't, I now say I did. Q. You say you did tell Mr. Nelson at that time that you would call the board together? A. No. I didn't say I would call the board. I said it would be presented to the board at some future meeting. . . .Q. Now, didn't you state, Mr. McCornick, in one of these conversations, that when the proper time should come, when things should quiet down, that the board and others would be informed of the fact you and Mr. Nelson had made whole this thing? A. So they were informed. Q. You stated, in accordance with your statement that they would be informed— A. It was the intention to inform the board at the proper time. Q. Wasn't it the intention also that you should ask others than yourself and Mr. Nelson, to contribute their proportion of this burden? A. I don't remember that that was brought up that we should ask them to do it. We were in hopes they would do it." In another portion of his testimony it appears he was asked and answered as follows: "Q. Now, Mr. McCornick, at the time of entering into this arrangement with Mr. Nelson, did you regard that you and Mr. Nelson were contracting with the bank? A. I certainly thought, expected, that the bank would reimburse us." True, he further testified that "I don't think I entered into any contract with the bank, it was all verbal talk," and that he paid the fifty thousand dollars "without getting any obligation of the bank to reimburse" him. But, from what is made to appear, it is quite

evident to me that at the time of the negotiations between himself and Nelson he in some way then expected and intended to be reimbursed. But, whether he did or not, it certainly is made evident that, when the defendant promised and agreed to pay thirteen thousand, two hundred and fifty dollars, he understood from all that was said and done at the time of the negotiations that he was in some way to be reimbursed.

It is not made to appear that either McCornick or the defendant owed the bank a dollar, or that either was responsible for the loss. Neither the money paid by McCornick nor that promised to be paid by the defendant was paid or promised by reason of such supposed or any other obligation owing by either of them to the bank. Neither was under any legal obligation to pay the bank anything. McCornick, however, paid the bank fifty thousand dollars, and the defendant promised to pay thirteen thousand, two hundred and fifty dollars. The money paid by McCornick and that promised by the defendant to be paid was either a gift, or was paid and promised under circumstances that repayment or reimbursement would be made. Upon the evidence I think the payments made and promised were not a gift, and were not intended as such. And neither in the court below, nor here, has the plaintiff contended that they were. And confessedly the money paid by McCornick was not a gift because there was no donee. He could not be donor and represent the donee at the same time. The law, therefore, implied a promise to repay him. The note given by Nelson was given under the same circumstances as the money paid by McCornick, except it may be said that as to Nelson the bank was also present through representative McCornick. The promise made by Nelson to pay could have been a gift had words of donation been used in the transaction and negotiations between McCornick and Nelson. But such words were not used. The language of both McCornick and Nelson shows that they were both in the same situation as to the bank, and hence, even if the words of McCornick do not show an express promise on the part of the bank to repay,

all the circumstances taken together are inconsistent with and exclude the idea of a gift, and at least show an implied promise of repayment.

