## LANE v. PETERSON et al.

No. 4405.　Decided Nov. 5, 1926.　Rehearing Denied Dec. 9, 1926.
(251 P. 374.)

*Marioneaux & Hogan* and *Ball, Musser, & Mitchell,* all of Salt Lake City, for appellants.

*Pierce, Critchlow & Marr,* of Salt Lake City, for respondent Lane.

*Van Cott, Riter & Farnsworth,* of Salt Lake City, for respondent Peterson.

*Wallace B. Kelly,* of Salt Lake City, for respondent Kelly.

GIDEON, C. J.

In June, 1923, the plaintiff Lane and cross-complainant Peterson were employed by the United Filters Corporation. Plaintiff by profession is an engineer and was at that time in charge of the Salt Lake City office of that corporation. It appears that the United Filters Corporation was engaged in manufacturing and selling a filtration machine or device used in mining and in sugar refining. It also appears that plaintiff had been engaged prior to this time in an effort to determine the value of certain clays for the purpose of filtration to be used in filtering and decolorizing oils. Defendant Kelly was a friend of Peterson, and he was also an acquaintance and friend of defendant Dastrup. The record also discloses that Peterson had requested Kelly to bring him samples of any clay deposits found in his travels about the state so that the same might be tested. In the early part of June, 1923, Kelly in conversation with defendants A. J. Nielson and Dastrup learned of certain clay deposits near the village of Draper, in Salt Lake county. A. J. Nielson knew of these clay deposits. Shortly after this conversation Dastrup accompanied Nielson to the clay deposits, procured samples, and the same were delivered to Kelly to be tested. He in turn took the samples to Peterson. This meeting of Peterson and Kelly occurred approximately two weeks after the meeting of Nielson, Dastrup, and Kelly. The tests made by Peterson indicated that the clay might be of commercial value. A few days later Dastrup obtained an option to purchase the land on which the then known clay beds were located. Title to this land was in one Fitzgerald. This option obtained by Dastrup included eighty acres. A little later a meeting was had by Peterson, Dastrup, and Kelly, and at this meeting it was suggested by Peterson that plaintiff, Lane, be invited to join the partnership or joint adventure. The reason given why it was desirable to have Lane interested was his experience in handling clays and the further fact that he was acquainted

with different concerns or corporations using clay. On August 27, 1923, Lane, Dastrup, Peterson, and Kelly executed the following paper:

"We, the undersigned, agree to participate equally share for share in what is known as the Dastrup clay, now controlled by George W. Fitzgerald.

"One A. J. Nielson will participate to the extent of one-fifth share in event he puts up his proportionate share of any expense incurred in acquiring and developing this property. If he does not share the expense his share in the property shall be determined by the other four.

"Should any of the undersigned fail to put up his proportionate share as the debt may be incurred he shall relinquish all right to participate in the enterprise and his interest shall revert to the other parties.

"Mr. Eph. Dastrup shall take charge of acquiring and developing the property and is authorized by this agreement to expend up to but not more than $1,200 to acquire right, title, and possession of above-mentioned property."

This paper was simply a memorandum of a verbal agreement then existing between the parties. All through the record the association of the parties is referred to as the "syndicate." Carrying out the understanding and agreement Dastrup, in behalf of the syndicate, obtained the title to the 80 acres of land then under option. The title was by agreement taken in his name. Both before and after signing the written memorandum some development or exploration work had been conducted on the property under the supervision of Dastrup. It was soon ascertained that all the clay beds were not located within the boundaries of the 80 acres purchased, but that additional clay beds were located on a 40-acre tract lying immediately east of and adjoining the tract purchased. This fact was reported by Dastrup to his associates, and it was agreed that he should attempt to purchase the eastern tract upon which the additional clay beds were located. He succeeded in buying 80 acres, which included the 40 acres in question. That purchase was concurred in by the other parties to the agree-

ment. Dastrup, with the consent of his associates, employed defendant Soren Nielson to assist in and who in fact did most of the manual labor required in digging trenches, boring holes, and such other work as was necessary in the efforts to locate and develop the beds of clay upon the premises under the control of the syndicate. In the latter part of August or early part of September, 1923, it was ascertained that farther east than any of the property controlled by the syndicate were other outcroppings of clay of the same nature as found on lands purchased from Fitzgerald. These additional clay beds were owned by two brothers, George and H. E. Stringfellow. The land purchased from Fitzgerald lies near the western base of the Wasatch mountains. The land owned by the Stringfellows lies east of this land and extends up into the small canyons or ravines of the mountains. The beds claimed to have been discovered by Soren Nielson are in one of these small canyons or ravines. It is the testimony of Soren Nielson that he discovered these additional clay beds not during the hours of employment but at other times, as expressed by him, when he was "scouting around through the mountains" in that vicinity. At that time he had a camp near the workings. On September 22, 1923, he obtained an option on 320 acres of land belonging to George and H. E. Stringfellow. This land included, in addition to the clay beds, strata of silica, and it was claimed that there was some value attached to this silica. It is, however, apparent that the principal value of the land was clay deposits, and it was so understood at the time of obtaining the option of September 22nd. It is admitted by both Dastrup and Soren Nielson that Dastrup had knowledge of the efforts of Nielson to obtain this option prior to the date of its execution. There had been negotiations with the Stringfellows for two or three weeks before the option was obtained. It is likewise admitted that Dastrup prepared the option that was finally executed. The testimony of both Dastrup and Nielson, however, is that Dastrup had no knowledge of the location of any clay beds upon the String-

fellow property until he was so advised by his employee Nielson, and that prior to being so advised Nielson had entered into negotiations with the Stringfellows to acquire an option on this property. It is claimed by Dastrup and Nielson, and so testified to by them, that they were attempting to locate the eastern corners of the Fitzgerald property, and for that purpose were measuring the distances with a surveyor's chain. As they proceeded eastward Nielson stated to Dastrup that if he went farther east he would run into a certain clay bed that he, Nielson, had discovered and for which he was at that time negotiating an option with the owners of the property. These defendants also testified that Dastrup had no knowledge of the existence of these additional clay beds and that his codefendant Soren Nielson had discovered the same and had been negotiating to obtain an option on the property; that Soren Nielson requested that Dastrup treat the information confidential that he had given him, and in no way interfere with Nielson's negotiations to obtain the option; that Dastrup agreed to so treat the information and undertook to assist in getting the option, and in turn requested Nielson to give him an option or right to repurchase the premises from him, Nielson, in the event that the latter obtained the option; that Dastrup assisted Nielson in getting the option from the Stringfellows; that Dastrup prepared the option and made one or two visits with Nielson to either one or both of the owners of the Stringfellow property. When this option was obtained the matter was reported to the other members of the syndicate, and after considerable negotiations, on the 12th of October, 1923, an agreement was entered into between Soren Nielson as party of the first part and the other members of the syndicate as parties of the second part, wherein it was agreed that Soren Nielson should turn over to the syndicate his option or right to purchase the Stringfellow property under conditions and provisions contained in that contract, and that he, Nielson, should have in turn one-fourth of the net proceeds of the sale of the combined

properties and that the other parties should receive three-fourths. Thereafter, on June 7, 1924, Dastrup entered into a written contract with one H. E. Bierce, wherein Dastrup agreed to sell to Bierce the combined properties for the sum of $80,000 payable in stallments, the first installment to be paid on September 15, 1924. It was provided in that contract that warranty deeds conveying title to the premises should be deposited in a local bank, and when the full amount of the contract price was paid these deeds were to be delivered to Bierce. The sum of $20,000 was paid and deposited to the credit of Dastrup in the Walker Bros. Bank of Salt Lake City as provided in the escrow contract. After Dastrup repaid from that amount the moneys which the members of the syndicate had advanced for the purchase of the Fitzgerald property and also the sum of $4,000 which the syndicate had agreed to pay as part of the purchase price of the Stringfellow property, he further deducted a commission of 10 per cent claimed by him for his services in selling the combined properties. He thereafter proceeded to pay to the plaintiff the amount that Dastrup estimated to be due him after deducting his commission. There was deducted from the one-fourth payable to Soren Nielson the 10 per cent commission and the sum of $1,760 which he, Nielson, had agreed to pay as a part of the purchase price for the 320 acres obtained from the Stringfellows.

It is charged in the complaint that Dastrup in investigating and developing the clay deposits included within the boundaries of the land under option from Fitzgerald "ascertained that said deposit was not contained in its entirety within the boundaries of the tract aforesaid, but that on the contrary a large and valuable part or portion of said deposit extended into and upon an adjoining tract of land known and described as * * *" (describing the Stringfellow property). It is further charged that Dastrup, with a view of obtaining a secret profit or advantage to himself at the expense of his associates, failed to inform his associates of this discovery, but secretly procured an option on

said ,adjoining land from the owners of the title, and, in order to deceive his associates, caused an option to be taken in the name of Soren Nielson. It is also charged that Soren Nielson had theretofore been employed by Dastrup and was then in the latter's confidence. It is alleged upon information and belief that Nielson never had any actual beneficial interest in the tract of land under option or otherwise, but at all times had been acting as an undisclosed and secret agent and "dummy" for Dastrup. It is further stated in the complaint that by reason of such facts so alleged the so-called contract of October 12, 1923, should be declared to be and is null and void, and that Dastrup "should and does hold said property and proceeds from the sale thereof in trust for the original members of said syndicate in the following proportions," etc. It is alleged in the complaint that the defendants C. J. Peterson, J. W. Kelly, and A. J. Nielson are made parties defendant in the action for the reason that they are necessary parties to a complete determination of the questions involved and their consent to being joined as parties plaintiff had not been had. The prayer of the complaint is: (a) That it be adjudged and decreed that the contract of October 12, 1923, is null and void and that Dastrup holds the property and the proceeds of the sale in trust for the members of the syndicate; (b) that Dastrup be required to account to plaintiff for all moneys received by him under the aforesaid contract for the sale of said property, and that the plaintiff have a decree against said Dastrup for any such sum as may upon an accounting be found due and payable to him. The prayer asks for general relief.

Subsequent to the filing of the complaint the defendant C. J. Peterson filed a cross-complaint in which he adopts the allegations of the complaint and asks for the same relief as does the plaintiff.

The trial court found all the issues of fact in favor of the plaintiff and entered its decree in accordance with the prayer of the complaint and of the cross-complaint of C. J. Peterson. From that judgment the defendants Ephraim

Dastrup, Soren Nielson, and A. J. Nielson appeal. J. W. Kelly did not join in the appeal. In a short brief filed for him by separate counsel he expresses his desire that the judgment of the district court be not disturbed.

The court found the making of the contract of August 27, 1923; that pursuant to that agreement Dastrup found deposits of clay on 160 acres of land belonging to one Fitzgerald and that upon his recommendation the syndicate purchased such land. The court further found that while investigating and developing the clay deposits on the Fitzgerald land Dastrup ascertained that all of the deposits of clay were not located within the boundaries of the Fitzgerald property, but that other large and valuable deposits, and which were necessary for the successful prosecution of the venture, extended into an adjoining 320 acres of land. The court's fourth finding is:

"That said Dastrup fraudulently, and with the purpose of obtaining a secret profit or advantage to himself at the expense of his associates, did not inform his associates of said discovery, but on the contrary covertly and secretly procured an option to purchase said adjoining tract of land from the owners thereof; that in order to deceive his said associates said Dastrup caused said option to be taken in the name of defendant Soren Nielson, which said defendant had theretofore been employed by and was then in the confidence of said Dastrup; that said defendant Soren Nielson did not have any actual or beneficial interest in said tract of land either under said option or otherwise but was and at all times throughout said transaction has been acting as the undisclosed and secret agent of said Dastrup."

The court further found that subsequent to obtaining an option on the additional 320 acres Dastrup reported that fact to his associates and also that such property was necessary for the successful conclusion of their venture; that relying upon the report, the contract of October 13, 1923, was made, ostensibly with Soren Nielson. The court's thirteenth finding is as follows:

"That there never existed between the members of said syndicate as such or between said Dastrup and either plaintiff or defendant

C. J. Peterson any understanding or agreement that said Dastrup should receive out of the proceeds of the sale of said property or otherwise any sum as a commission for the sale of said property or as compensation for services or any sum whatever except his proportionate share of the profits of said enterprise."

It is further found by the court that all the members of the joint venture were expected to and did devote their time to and performed valuable services in behalf of the enterprise. A finding is also made that Soren Nielson throughout the entire transaction acted merely as the agent of Dastrup and is not actually or beneficially interested in the property of the syndicate or the proceeds of the sale thereof unless such interest is with other members of the syndicate other than the plaintiff, Lane, and the cross-complainant Peterson.

The conclusions of law and the judgment of the court follow the findings.

The assignments assail the court's findings as being against the weight of the evidence.

This is an equitable action, and this court is therefore required to examine the evidence to determine whether the facts found are contrary to the weight of the evidence, keeping always in mind that a finding of a trial court upon conflicting evidence will not be disturbed unless it is made to appear that the court has misapplied proven facts or made findings clearly against the weight of the evidence. There is no serious contention about the rules of law applicable if the court's findings are supported by the evidence.

The testimony supports the allegations of the complaint and the findings of the court that in the summer of 1923, the plaintiff and the defendants C. J. Peterson, Ephraim Dastrup, A. J. Nielson, and J. W. Kelly entered into an agreement or contract of joint venture whereby each party agreed and undertook to contribute equally towards the expense of acquiring, developing, and marketing a certain deposit of clay located in Salt Lake county, and further un-

dertook and agreed that the parties should share equally
in the profits or advantages that might accrue therefrom,
and also that it was agreed and understood that Dastrup
should take active charge for and on behalf of the syndicate
in the matter of acquiring and developing said deposits. It
is also clearly established by both the written memorandum
of August 27, 1923, and oral testimony that Mr. Dastrup
was to be the active representative of the syndicate and was
authorized to contract in his own name for the purchase
and development of land upon which the particular clay
should be found and to employ the necessary labor to deter-
mine the location of the clay beds or deposits and to develop
or ascertain the extent of the same. It is also conclusively
shown that Dastrup did, with the knowledge and consent
of the other members of the syndicate, contract for the pur-
chase of the original 80 acres from Fitzgerald on which the
clay was first known to be, and, upon later ascertaining
that the clay was located on an additional 80 acres, likewise
purchased that land. The testimony of the various wit-
nesses is that from the very inception of the enterprise the
members of the syndicate realized that success of the ven-
ture would depend to a very large extent upon the syndi-
cate controlling all of the land in that locality upon which
this particular clay was located. That was the controlling
reason which induced the contract of October 12, 1923,
wherein the parties to the memorandum of August 27, 1923,
agreed that Soren Nielson should receive one-fourth of the
proceeds of the sale.

If the fourth and thirteenth findings of the court quoted
above are supported by the evidence, that court's decision is
clearly right; if not, the judgment should be modified.
In the opinion of the writer the findings of the trial
court are supported by the evidence and should be af-
firmed. A majority of the court are, however, of opinion
that the trial court's finding No. 4 is clearly against the
weight of the evidence and should be set aside. It is claimed
that it is quite conclusively shown that at the date of the

contract of August 27, 1923, the members of the syndicate were of the opinion that the clay beds intended to be exploited and developed were located upon the 80-acre tract of land upon which Dastrup then held an option. At a later date it was discovered that additional beds of the same clay were located on an adjoining 80-acre tract lying to the east of the tract purchased. That additional 80-acre tract was acquired by the syndicate. The testimony of both Soren Nielson and Mr. Dastrup is positive that Soren Nielson discovered the additional clay beds on the Stringfellow property and that Dastrup had no knowledge of such deposits until advised by Nielson. While it is true Dastrup assisted Nielson in acquiring the option, prepared the proposed option first presented to the Stringfellows as well as the further option that was finally executed, nevertheless, the acts and conduct of Dastrup are explained and the reasons which impelled him to assist in the negotiations to acquire the option given. It is the testimony of both Dastrup and Nielson that the latter had initiated negotiations with the Stringfellow brothers prior to the date that Dastrup knew that any clay deposits were located within the boundaries of the Stringfellow property. It is also the testimony of these witnesses that Nielson requested Dastrup not to interfere with the negotiations, to treat the fact of the existence of these clay beds as confidential, and that Dastrup assisted in the negotiations for obtaining an option. It also appears that Nielson had been employed by Dastrup in previous years and that their relations were friendly; that Nielson was a man without business experience; that he was unable to prepare an option; and that Dastrup had had experience in that line of business for a number of years. It also seems that Dastrup, as a condition for assisting in acquiring an option, requested that Nielson would in turn give him, Dastrup, an option to purchase the property after Nielson had acquired an option from the Stringfellows. In other words, it is the opinion of the court that these acts of Nielson and Dastrup are explainable upon a theory consistent with good

faith and fair dealing on the part of both, and that for such reason fraud should not be presumed or deduced from other and surrounding facts and the relationship of the parties unless such circumstances compel a different conclusion. The finding that Dastrup "fraudulently and with the purpose of obtaining a secret profit or advantage to himself at the expense of his associates" is and must be based on an inference or deduction from the proven fact that Dastrup was the representative of the syndicate to acquire and develop the clay beds in that vicinity for the interest and benefit of the members of the syndicate, and from the additional fact that he assisted in the negotiations to obtain the option and did not advise his associates of the existence of these additional clay beds until after such option had been obtained in the name of Nielson. That finding must of necessity run counter to the positive and direct testimony of both Dastrup and Soren Nielson that the clay beds were discovered by Nielson, that Dastrup had no knowledge of their existence, and that Nielson had instituted negotiations for obtaining an option prior to the knowledge of Dastrup or prior to any communication made to Dastrup. The claim of Soren Nielson that he knew of the existence of these additional clay beds prior to his communication of such knowledge to Dastrup and that he had instituted negotiations to obtain an option to purchase the lands upon which they were located finds some corroboration in the testimony of another witness, who testified that he gave Mr. Nielson the name of the owners of the property and introduced him to one of the Stringfellow brothers at a date prior to the alleged conversation in which Nielson advised Dastrup of the existence of the additional clay beds. It is a well-established rule of law that fraud is never presumed, that when a transaction is explainable upon the theory of honesty and fair dealing that theory will be adopted "unless the evidence clearly preponderates in favor of the illegal aspect of the transaction." *Utah Nat. Bank v. Nelson,* 38 Utah, 169, 111 P. 907.

In the course of the opinion in *Ferrell v. Wiswell*, 45 Utah, 202, 143 P. 582, it is said:

"We have no right to overlook the wholesome rule that where deeds or contracts are sought to be vacated and set aside upon the ground of fraud and deceit, the burden of proving the alleged fraud is upon him who asserts it; moreover, that the fraud must be established by clear and convincing evidence. While fraud need not necessarily be established by direct evidence, yet from all the evidence, whether direct or circumstantial, it must be made to appear with reasonable clearness that the act in question was induced by fraud or deceit in order to authorize relief in an action of this kind."

The court is of the opinion that the record does not contain such clear and convincing evidence as is required to authorize a court to declare null and void the contract made between Soren Nielson and the members of the syndicate under date of October 12, 1923. There is no claim, nor can there be under the facts shown in this record, that Soren Nielson stood in such confidential or fiduciary relation to the members of the syndicate that he was under any legal obligation to, or could be required to, account to the members of the syndicate for any additional clay beds discovered or located by him.

Passing now to the other question presented by the record, namely, the deduction by Dastrup of 10 per cent commission for the sale of the property, the court in its fourth finding quoted found that no agreement to pay commission existed. We have little difficulty in concluding that that finding is supported by the evidence. Practically the only evidence in support of Dastrup's claim for commission is a general agreement or understanding had between the parties at a meeting in which they were discussing and considering the employment of an outside party to sell the property. The members of the syndicate at that meeting had under consideration a particular individual who it was thought might procure a purchaser. It was agreed that such agent should receive 10 per cent commission if a sale were consummated. There is some testimony that at this

meeting it was agreed than any one procuring a purchaser should be entitled to receive 10 per cent commission whether he were a member of the syndicate or not. The testimony in that regard, however, is indefinite and not satisfactory. That finding of the court is therefore supported.

The trial court found this to be a joint venture. In *Forbes v. Butler*, 66 Utah, 373, 242 P. 950, this court said: "A joint venture is in the nature of a partnership. * * * The law of partnership applies as far as substantial rights are concerned." The rule of law governing the right of members of a partnership to receive compensation for services rendered in conducting partnership business is stated in 20 R. C. L. at page 877, as follows:

"The general rule is that a partner is not entitled to compensation for services in conducting the partnership business beyond his share of the profits unless there is a stipulation to that effect, and that he has no right by implication to claim anything extra by reason of any inequality of services rendered by him, as compared with those rendered by his copartners. The reason for this rule lies in the fact that each partner, in taking care of the joint property, is practically taking care of his own interest and is but performing his own duties and obligations growing out of the partnership."

The cause will be remanded to the district court, with directions to that court to recast its finding No. 4 in accordance with the views herein expressed, to set aside its decree holding and declaring the contract of October 12, 1923, to be null and void, and requiring defendant Dastrup to account for one-fourth of the sale price of the combined properties that is payable to Soren Nielson under the contract of October 12, 1923. In all other respects the judgment of the district court is affirmed.

No costs will be allowed either party on this appeal.

THURMAN, J., concurs.

FRICK and CHERRY, JJ., concur in the result.

STRAUP, J., concurs in the judgment.