# WASATCH LIVESTOCK LOAN CO v. LEWIS & SHARP et al.

No. 5378. Decided August 27, 1934. (35 P. [2d] 835.)

*Thomas & Thomas,* of Salt Lake City, for appellant.

*A. R. Barnes, L. B. Wight,* and *P. C. Evans,* all of Salt Lake City, *Wm. E. Davis,* of Brigham, and *Thatcher & Young,* of Ogden, for respondents.

STRAUP, Chief Justice.

The Wasatch Livestock Loan Company brought this action against Siney Lewis, Clara A. Lewis, and J. Steward Sharp, Jr., copartners, Newell K. White, N. R. Petersen, Eli Anderson, the First National Bank of Brigham City, and Tremonton Banking Company, on foreclosure of a chattel mortgage in the sum of $45,000 on 9,777 ewe lambs on a ranch at or near Promontory Point in Box Elder county, Utah. The mortgage was executed by the partnership, Lewis & Sharp,

to the plaintiff October 22, 1929. When the action was commenced, the partnership owned and possessed only about 4,000 or 5,862 head of lambs. Of these, White claimed he had a mortgage on 849 head, executed November 23, 1929, being a part of a sale of 1,849 lambs sold by him to Lewis & Sharp, September 25, 1929, for $15,738, of which $10,103 were paid in cash, and later the mortgage given for the remainder of the purchase price amounting to $5,635. Of the 4,000 or 5,862 head claimed to be owned by Lewis & Sharp and which the plaintiff claimed were included in its mortgage, Petersen claimed ownership of 607 head on which he, October 23, 1929, gave the Tremonton Bank a mortgage for $5,000 for money borrowed with which to purchase such lambs, which mortgage he and the Tremonton Bank asserted was superior and paramount to plaintiff's mortgage. Likewise, Anderson, of the 4,000 or 5,862 head, claimed ownership to 605 head on which he, October 5, 1929, gave the First National Bank of Brigham City a mortgage in the sum of $5,000 for money borrowed by him from the bank with which to purchase such lambs, which he and the bank asserted was superior and paramount to the mortgage of the plaintiff. Pending the proceedings, and with the consent of all parties concerned, the 4,000 or 5,862 head of lambs by order of court were sold for $32,000 and the proceeds thereof turned over to the plaintiff, but to be retained by it, until the determination of the respective rights of the parties in the action.

The case was tried to the court. It was found and adjudged that the plaintiff's mortgage was superior and paramount to all of the claims of the defendants, except that of the First National Bank of Brigham City; that, after giving credit for partial payments made on plaintiff's mortgage, there was due the plaintiff and unpaid the sum of $32,989, and, after applying thereon the proceeds of $32,000 derived from the sale of the sheep, there remained due and unpaid on plaintiff's mortgage the sum of $989, together with $914 advanced by plaintiff to Lewis & Sharp in accordance with the terms of the mortgage and secured thereby, or a total

amount due and unpaid of $1,903, and an attorney's fee of $3,100.

As to the First National Bank of Brigham City, the court found that its mortgage lien was superior to that of plaintiff's; that the proceeds of the sale of sheep were to be prorated between the plaintiff and the bank, the bank given $605/_{5862}$ of $32,000, or $3,296; and, since the whole of the $32,000 was paid to the plaintiff, the court required it to pay the Brigham City Bank $3,296, its proportion of such proceeds, gave the bank judgment against the plaintiff for such sum, and further gave the bank judgment against Anderson for the difference between such amount and the amount due from Anderson on his mortgage, amounting to $2,346 and attorney's fee.

The Tremonton Bank was given judgment against Petersen for the amount due it on his mortgage, amounting to $6,008 and $600 attorney's fees. Judgment was given in favor of White and against Lewis & Sharp for $5,669, the amount due him on his mortgage from them to him, and $600 attorney's fees. No judgment was given against the plaintiff in favor of the Tremonton Bank, or of Anderson, Petersen, or White. In other words, as to all of the defendants the plaintiff on its foreclosure prevailed, except as against the First National Bank of Brigham City.

The plaintiff, as against the Brigham City Bank, appeals from that part of the judgment holding the bank's mortgage superior to that of the plaintiff, and requiring the plaintiff to prorate with the bank the proceeds of the sale of the sheep and rendering judgment for such amount against the plaintiff and in favor of the bank. The defendants White, Anderson, Petersen, and the Tremonton Bank each separately appeal from that part of the judgment holding plaintiff's mortgage superior to their respective claims and not awarding them anything out of the proceeds of the sale of the sheep.

The partnership, Lewis & Sharp, was engaged in buying, selling, and feeding sheep on a rather large ranch of about

45,000 acres near Promontory Point in Box Elder county. On or about September 20, 1929, about a month prior to the execution of the mortgage by them to the plaintiff, Lewis & Sharp, a copartnership, as party of the first part, and the defendants Anderson, Petersen and three others, Conrad, Holmes, and Warren, as parties of the second part, entered into a written agreement referred to in the record as Exhibit C, wherein it was recited that the first party had access to a range of lands near Promontory Point on which they desired to range ewe lambs until the next summer, and that the second parties desired to stock such range with lambs, and by the terms thereof it was provided that the parties signing as the second part were to have an interest in the "contract rights and the proceeds and profits thereof," in proportion to the amount of money contributed by each party of the second part; that the first party had the right to solicit other members as second parties who, upon signing the agreement, had the same rights as the second parties who already had signed the agreement; that "the title to such lambs should be taken in the name of the first party, Lewis & Sharp"; and that it had "the right to mortgage the same to the extent of $5 per head to supplement the amount raised by the second parties, the two sums to be used solely in the purchase and delivery of the lambs at Promontory Point, Utah"; that the first party at its own expense was to furnish range for the lambs and to have the sole care and management of them, "including the purchase and resale of them and their wool," and that the lambs were to be ranged by turning them loose on the range at Promontory Point; that the first party was to pay all taxes and costs of shearing and caring for and maintaining the lambs; that, on a resale of them, the first party was to apply the proceeds of sale, first, to the "payment of chattel mortgage on these lambs"; second, to retain 25 cents per head per month for ranging, etc.; thirdly, to costs of supplying feed (hay, corn, etc.) to the lambs in case such feeding became necessary; and that the balance was to be divided by the first party among the members of the

second party in proportion to the amount contributed by each. In accordance with such agreement, Lewis & Sharp signed and subscribed $10,000, Frank Conrad $5,000, Eli C. Anderson $5,000, N. R. Petersen $5,000, Eugene Holmes $500, and Walter S. Warren $500.

White was not a party to the agreement. He, September 25, 1929, sold to Lewis & Sharp 1,849 lambs for $15,738, $10,103 of which was paid in cash, and the balance of $5,635 to be paid in a few days. The lambs were delivered by White to Lewis & Sharp at Promontory Point, and there on the ranch mingled with other lambs of the partnership and of the joint adventure. White claimed he had an oral agreement with Lewis, who conducted the purchase of the lambs on behalf of the partnership, that the title to the lambs should not pass until they were fully paid for. Lewis, by his testimony, denied there was any such agreement. The court, in accordance with his testimony, so found, and that title to the lambs on delivery passed from White to Lewis & Sharp. White at divers times demanded payment of Lewis & Sharp for the balance remaining due and unpaid. Lewis & Sharp each time promised to pay the same, but failed to do so. So, on November 23, 1929, Lewis & Sharp executed and delivered to White a promissory note for the amount remaining due, but dated it back to September 25 when the sheep were sold, and, to secure the payment of the note, Lewis & Sharp at the same time gave a chattel mortgage on 849 lambs of the general herd covered by and included in plaintiff's mortgage given October 22, 1929. It is not clear whether the lambs so mortgaged by Lewis & Sharp to White when the mortgage was given could be identified from the rest of the herd of lambs of Lewis & Sharp on the range. But it is quite clear that they could not be so identified at the commencement of the action.

The court found and held that White neither orally nor otherwise had retained title to the lambs sold by him to Lewis & Sharp, and that title passed from him to them at the time of the sale and delivery. In view of such findings,

it is unnecessary to determine whether the claimed retention of title by White was valid because not in writing and not filed for record as provided by Laws of Utah 1921, c. 3. The court thus found White's mortgage inferior to that of plaintiff's, and rendered judgment accordingly. The court, however, on White's counterclaim against Lewis & Sharp, gave White judgment against them for the amount due and unpaid, amounting to $6,569 and $600 attorney's fees. We are of the opinion no error was committed by the court in refusing to render judgment against the plaintiff and in favor of White, and that the judgment appealed from by him is therefore affirmed.

The mortgage from Lewis & Sharp to the plaintiff was on 9,777 head of cross-bred ewe lambs, wool branded with the figure "9" on the back and marked with various earmarks, together with all increase and accretions, "and also together with all ewe lambs then and thereafter owned or possessed by the mortgagors and in or to which they or either of them might have or acquire any right, title or interest during the life of the mortgage, whether marked or branded as aforesaid or otherwise," and "that the said marks and brands are the holding marks and brands although the said livestock may have other marks and brands." The mortgage was given not only to secure the payment of a promissory note of $45,000, but also to secure additional loans and advances which the mortgagee might thereafter make to the mortgagors, for the care, maintenance, protection, and marketing of the mortgaged property.

The status of the claims of Anderson and Petersen and of the mortgages given by them to the Brigham City Bank and to the Tremonton Bank is chiefly dependent upon the question of whether Anderson and Petersen were the owners of the lambs claimed by them or whether the title and ownership in accordance with the joint adventure were in Lewis & Sharp with express authority to mortgage the lambs. It in effect is conceded that, if Exhibit C, the joint adventure agreement, was in full force and effect, and if the lambs

claimed by Anderson, 605 head, and 607 head claimed by Petersen, were purchased or procured in pursuance of such agreement, the title and ownership of such lambs were in Lewis & Sharp with full right and authority to mortgage them to the plaintiff, in which case the mortgages given to the banks by Anderson and Petersen were on lambs not owned by them.

Anderson and Petersen admitted, and so testified, that Exhibit C on or about September 20, 1929, was signed by them together with the other parties to the agreement, but claimed that they through fraud and misrepresentation of Lewis were induced to sign the agreement, and that they signed it believing it was an agreement of a different character, especially in the particular that the agreement which they thought they were signing did not have the provisions or stipulations that the title or ownership of the lambs to be purchased or procured with moneys of the second parties was to pass to Lewis & Sharp, or that the interest of the second parties was only in the profits of the adventure, or that Lewis & Sharp were given the right or authority to mortgage such lambs, and hence contended that Exhibit C was not the real contract between the parties. What they claimed in such respect was that the real agreement was to the effect that each was to give Lewis & Sharp $5,000 with which to buy lambs at 12 cents a pound, weighing 68 or 70 pounds, and that such lambs were to be purchased for and on behalf of Anderson and Petersen to be ranged on the ranch of Lewis & Sharp; that such lambs when acquired were to be branded with their own brands; and that title and ownership of such lambs were to be in them and not in Lewis or Sharp. Their claim and testimony is completely at war with the contents and terms of Exhibit C which they with others admittedly signed. They testified that they did not read Exhibit C before it was signed by them; that another writing purporting to be the agreement was read to them, or that Exhibit C was misread, which, as so read, was not in accordance with the terms and conditions of Exhibit

C; that a copy of the agreement was handed them, but which they did not read before they signed Exhibit C; that later, that evening or the next morning, they read the copy, and then discovered as claimed by them that it was not in accordance with the agreement as read to them, but was, as they later discovered, in accordance with Exhibit C signed by them. When the agreement was signed, Anderson and Petersen each gave a check for $5,000 on the Brigham City Bank, which checks Lewis indorsed and mailed them to his bank to be deposited to his account. The next morning Anderson and Petersen, discovering, as they testified, that the copy of the agreement handed them did not express the real agreement, stopped payment of the checks on the Brigham City Bank. In the meantime Lewis had gone to Idaho to purchase lambs and entered into negotiations to purchase about 2,000 head. Before the lambs, to be shipped in car lots, arrived at Promontory Point, Lewis discovered that payment of the checks had been stopped. As testified to by Anderson and Petersen, Lewis inquired of them why payment of the checks had been stopped. They stated that the copy of the contract handed them was contrary to the real bargain and agreement, and testified that Lewis, looking at the copy, stated that the wrong copy inadvertently had been handed them, and that such copy was not in accordance with the terms and contents of the contract signed by them which, after it was signed, was sent to Salt Lake City and put in his box; that he would procure the contract and show it to them, and assured them that the contract so signed was just as it was read to them or that he would destroy it and that another could be entered into; that Lewis stated that he, relying on the checks, had advanced $1 a head on the lambs purchased by him; and that, unless the checks were available, the situation would seriously embarrass him. They further testified that Lewis did not, as he had promised, produce or show them the contract, Exhibit C, signed by the parties thereto. As further testified to by Anderson and Petersen, they, relying on what Lewis told them that the

contract signed by them was not in accordance with the copy handed them, and without Lewis producing Exhibit C, and without further inquiry as to its contents, further dealt with Lewis with respect to the subject-matter; that about a week thereafter, and on October 4, 1929, Lewis informed them that the lambs were being shipped and would arrive at Promontory Point on the following day; that there would be about 600 head each for Anderson and Petersen, and told them to make arrangements to brand them; that, when the lambs were unloaded, 605 head were branded by Anderson with his wool brand, "a green A," and 607 branded by Petersen with his wool brand, "a green N," and the lambs then turned loose on the ranch; on the next day, Anderson gave the Brigham City Bank a mortgage on the 605 head branded with his wool brand and directed the bank to honor his check for the $5,000 theretofore issued by him, which was done, and the moneys paid to Lewis, or to Lewis & Sharp.

Petersen, when he stopped payment on his check drawn on the Brigham City Bank, at first declined to have anything more to do with the deal, but, after talking with Lewis and relying upon the statements made by him, he, instead of permitting his check drawn on the Brigham City Bank to be reinstated or honored, made arrangements to borrow $5,000 from the Tremonton Bank. He thereupon gave the bank a mortgage, October 23, 1929, on the 607 head of lambs branded with his wool brand to secure the payment of $5,000, which moneys on Petersen's check were paid to Lewis. At shearing time the following spring, when the whole herd was sheared by Lewis & Sharp, the wool brands on the lambs mortgaged by Anderson and Petersen were obliterated; that, according to the testimony of Anderson and Petersen, Lewis agreed to rebrand such lambs with their wool brands before turning them back with the herd, but that Lewis failed to do so, and thus, when this action was commenced, the lambs claimed by Anderson and Petersen were incapable of identification from lambs of the general herd.

The cashier of the Brigham City Bank testified that in the fall of 1929 Anderson, Petersen, and Lewis came to the bank, that Lewis stated he was going to buy some sheep for Anderson and Petersen to be ranged on his Promontory ranch; that he was anxious to get his range filled up; and that he was going to buy some sheep for Anderson and Petersen, and wanted to be sure that they were going to get the money after he had purchased the sheep. In reply thereto the witness stated that, just as soon as the sheep were delivered, they would get the money, but that the sheep must first be branded and counted; that Anderson and Petersen arranged to get the money, but later stopped payment on checks issued by them to Lewis; that the bank had no further dealings with Petersen, but later, after the sheep arrived and were unloaded on or about October 7, 1929, and on being informed by Anderson that 605 head were counted and branded with his brand, the bank took a mortgage on such sheep, and at Anderson's direction honored and paid his check to Lewis.

Lewis in substance testified that Exhibit C, as signed by the parties thereto, was the real and only contract entered into by them; that it was read to Anderson and Petersen before they signed it; that it was handed to them for their signature, and, before they signed it, it was looked over by them and was discussed; that it was correctly read to them; that each had the opportunity to read it; that no other or different agreement or writing was presented or read; and that the only writing read or discussed was Exhibit C. Considerable evidence was given with respect to such issue. The evidence is in direct conflict. As to that the court found:

"20. That in executing and signing the said joint adventure agreement 'Exhibit C,' the defendants, Eli Anderson and N. R. Petersen, severally, read or had read to them, and each of them, said agreement and the full, true and complete contents thereof, and so signing the same well and truly knew and understood the agreement and all and singular the terms, provisions, conditions and contents thereof, and neither the defendant Siney Lewis, nor any other person, whatever, fraudulently, wrongfully, or at all, misread or misrepresented

said agreement nor its contents, nor any part thereof, to them or either of them, nor were they or either of them fraudulently or otherwise wrongfully induced to sign the same, but they and each of them, in so doing, were fully and completeley advised and aware of the contents thereof and in so signing did so freely and voluntarily and intending to be bound thereby, and without any fraud or misrepresentations having been practiced upon or made to them, or either of them. That it was not agreed between said Lewis and Sharp, a copartnership, or Siney Lewis on the one part, or the defendants, Eli Anderson and N. R. Petersen, or either of them, on the other, that they, said Eli Anderson and N. R. Petersen would borrow or raise funds and deliver the same to Lewis and Sharp or to Siney Lewis to be used for the purpose of purchasing sheep for said Eli Anderson or N. R. Petersen or either of them, nor did said Lewis and Sharp or Siney Lewis purchase any sheep whatsoever, for said Eli Anderson and N. R. Petersen, or either of them, but on the contrary, and before said joint adventure agreement was signed, it was orally agreed by and between said Lewis and Sharp and said Eli Anderson and N. R. Petersen that they and each of them would enter into said joint adventure agreement according to the terms and provisions thereof, and as set out therein, and not otherwise, and that said Eli Anderson and N. R. Petersen would each raise, subscribe and pay to Lewis and Sharp thereunder and for the purpose thereof, $5,000.00, and said oral agreement was thereafter reduced to writing as said joint adventure agreement and was wholly and completely embodied and set out therein.

"21. That notwithstanding said joint adventure agreement and the agreemeent of the parties thereto in that behalf that the said Lewis and Sharp should receive said sums and invest the same in ewe lambs according to the terms and conditions thereof, and should take and have title thereto and ownership and possession thereof and the right and power to mortgage the same, but contrary to said agreement, the defendants, Eli Anderson, N. R. Petersen, and Siney Lewis, together, went to the defendant, First National Bank of Brigham City and stated and represented to it that 605 head of lambs should and would belong to the defendant Eli Anderson, and that he should and would have power to mortgage the same to said defendant bank, in pursuance whereof the said bank took and accepted its mortgage from said Eli Anderson, as hereinbefore set forth. That said joint adventure agreement was never rescinded nor terminated, nor was any new, subsitituted or other agreement made or entered into by or between the parties thereto, or any or either of them, nor did the defendants, Eli Anderson and N. R. Petersen, or either of them, make or enter into any new, substituted or other agreement with the defendant Lewis

and Sharp, nor with the defendant Siney Lewis or any other party or parties thereto, or at all, in lieu or subsitution of said agreement, but the same was and at all times continued to be in full force and effect and was and is the only agreement between the said parties, whatsoever."

Exhibit C, the joint adventure agreement, was in haec verba, together with the signature of the parties thereto, set forth in the complaint of the plaintiff, and in which complaint it was expressly averred that in the month of September 1929, and prior to the execution and delivery of the mortgage by Lewis & Sharp to the plaintiff, the parties, including Anderson and Petersen, entered into such agreement by the terms of which the second parties agreed to pay Lewis & Sharp the sums of money set oposite their names to be invested in ewe lambs, as by the agreement provided and upon the terms and conditions therein stated; that Lewis & Sharp should take and have title, ownership, and possession of such lambs, "and should have the right and power to mortgage the same"; that the lambs "should be owned, ranged and herded by Lewis & Sharp, until the summer of 1930 or thereafter, and then resold, and the proceeds applied first to the payment of the chattel mortgage, then to costs and expenses of ranging and feeding the sheep, and the balance divided among the parties according to their respective contributions to the enterprise." All that, and the existence of Exhibit C in full force and effect, were expressly admitted by both the Brigham City Bank and the Tremonton Bank by their respective verified answers filed to the complaint of plaintiff.

Anderson and Petersen, for reasons heretofore stated, denied the validity of Exhibit C. They complain of the findings referred to on the ground that they are not supported by the evidence or are against the clear preponderance of the evidence. Anderson and Petersen, having admitted that some sort of a joint enterprise was entered into, and having admitted signing Exhibit C, had the burden of proof to show the fraud and misrepresen-

tation alleged by them and through which they were induced to sign Exhibit C or prevented from reading it or knowing its contents before they signed it. They were required to show that by satisfactory evidence. They both were of mature judgment, and had more or less business experience, especially in the sheep business. They were not ignorant men. They could read and write. They had every opportunity to read Exhibit C and to familiarize themselves with the contents thereof before signing it. Before they signed Exhibit C, it already was signed by Lewis & Sharp and by one of the parties of the second part. So far as disclosed by the record, none of the parties of the second part, except Anderson and Petersen, claimed Exhibit C was not the actual agreement entered into, or that it in any particular had been modified or abrogated. The existence or nonexistence of Exhibit C rests chiefly upon the credibility of Anderson and Petersen on the one side and Lewis on the other, and the weight to be given their testimony. In some particulars the testimony of neither is very satisfactory. There is, however, an irreconcilable conflict in their testimony as to the circumstances of Anderson and Petersen signing Exhibit C and as to their signing it without knowledge of its contents. If by fraud practiced on them by Lewis misreading Exhibit C to them, or reading to them another writing purporting to be the contract with contents materially different from Exhibit C, and thereby prevented them from reading Exhibit C or familiarizing themselves with its contents before signing it, and that they by such trickery were induced to sign something not intended to be signed by them, the facts as to such fraud, when denied as it is, were required to be established by clear and convincing evidence. *Ferrell* v. *Wiswell*, 45 Utah 206, 143 P. 582, affirmed in *Lane* v. *Peterson*, 68 Utah 585, 251 P. 374, 13 C. J. 370. Because thereof and that the essentials of the matter rested largely on the credibility of the witnesses and the weight to be given their testimony, we think it was peculiarly within the province of the trial court, who was in better position than we to pass

on their credibility and the weight to be given their testimony and to ascertain and determine the truth of the controverted issue. We think the court justified in finding on and disposing of the issue as he did, and on the record we are not prepared to say that such finding is not supported by or is against the fair preponderance of the evidence.

The court below having found that Anderson and Petersen, with full knowledge of the contents of Exhibit C, voluntarily signed it, and that it in no particular was abrogated, changed, or modified, and that the lambs in question were purchased and acquired in pursuance thereof it follows that the title and ownership of the lambs passed to Lewis & Sharp with full right and power to mortgage them to plaintiff. Because of such finding, it also follows that the mortgages given the banks were inferior to that of the plaintiff, for that, as against the plaintiff, the banks could not acquire any greater right than was possessed by Anderson and Petersen and as defined by Exhibit C.

Further, the banks by their verified pleadings having admitted the existence of Exhibit C, that it was in full force and effect, and that title and ownership of lambs to be purchased with moneys of the second parties to the agreement were to pass and vest in Lewis & Sharp, with full right and power to mortgage them, must be held bound by such pleadings. It is familiar doctrine that pleadings in a pending cause are more than admissions; that until changed they are conclusive on the parties pleading them and cannot be controverted by the pleader either in the trial court or on appeal. 1 Bancroft, Code Pleading, 626; 49 C. J. 122; *Sutton* v. *Otis Elevator Co.*, 68 Utah 85, 249 P. 437; *Heywood* v. *Ogden Motor Car Co.*, 71 Utah 417, 266 P. 1040, 62 A. L. R. 1232.

The banks thus for such additional reasons may not be heard to say that Exhibit C did not constitute the actual agreement between Lewis & Sharp and Anderson and Peter-

sen, or that the agreement was abrogated or modified or that the lambs claimed by Anderson or Petersen were not purchased and acquired in pursuance thereof. Apparently the court held the mortgage given by Anderson to the Brigham City Bank superior to that of the plaintiff on the theory and on the finding that Lewis and Anderson represented to the bank that lambs to be purchased with moneys of Anderson were to belong to him with right to mortgage them, and that the mortgage given by him to the bank was prior to that of the plaintiff; and, because the lambs at the commencement of the action could not be identified from other lambs of the herd, the bank was given a pro rata interest in the proceeds of the sale of the herd and judgment rendered accordingly. But the case lies deeper than that. The finding of the court is that the joint adventure agreement was not abrogated, changed, or modified or that any new agreement was entered into between Lewis and Anderson, or by any of the parties to the agreement. The finding is that Lewis and Anderson made some statement or representation to the bank contrary to the agreement. Let it be assumed that they in such particular practiced a fraud upon the bank, and thereby induced it to make a loan to Anderson which it otherwise would not have done. That, however, as against the plaintiff, did not abrogate or change the terms or conditions of the joint adventure agreement— in the nature of a partnership, *Forbes* v. *Butler*, 66 Utah 373, 242 P. 950—admittedly entered into and in full force and effect when the mortgage by Anderson was given the bank. In other words, one may not, so as to affect rights of third parties, assert title when he has none, though the party to whom the presentation is made may act upon it and be deceived to his injury. Had Lewis and Anderson been the only parties to the joint adventure agreement and falsely asserted their status with respect thereto, as between them and the party to whom the misrepresentation or false statement was made and who acted on it to his injury, they well might be estopped and precluded from asserting the true

status, but not so as to a third person who innocently and in good faith acquired rights under the true status or relation. Lewis, Anderson, and Petersen were not the only parties to the joint adventure agreement. They neither severally nor jointly, without the consent of the other parties to the agreement, could abrogate, change, or modify it, so as to affect rights of others acquired thereunder.

So we come back to the proposition as first stated that, if the joint adventure agreement was in full force and effect, and that title and ownership of lambs to be purchased by Lewis & Sharp with moneys from the second parties, including Anderson and Petersen, passed and vested in Lewis & Sharp with right and power to mortgage the lambs, and as expressly admitted by the banks, it follows, as against the plaintiff who innocently acquired its mortgage under the true relation of the parties vesting title in Lewis & Sharp with power to mortgage the lambs, that the mortgages given the banks by Anderson and Petersen, who were without title or ownership, are inferior and subordinate to the plaintiff's mortgage.

In view of the conclusions reached by us, it is unnecessary to consider other questions presented on the several appeals. The judgment on plaintiff's appeal as against the Brigham City Bank is therefore reversed, and the case remanded, with directions to enter judgment in favor of the plaintiff. In all other respects, and on the other several appeals, the judgment or judgments in the court below are affirmed. Because of difficulty in segregating costs on the appeal, each party is required to pay his or its own costs. Such is the order.

ELIAS HANSEN, FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.